IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION

IN RE:      JAMES VICTOR RICHMOND AND          CASE NO. 2:07-bk-14908M
            JILL JANETTE RICHMOND                CHAPTER 7

            Debtors.

SOUTHERN BANCORP SOUTH f/k/a/
FIRST BANK OF THE DELTA, N.A.                                      PLAINTIFF

V.                                     AP NO. 2:08-ap-1135

JAMES VICTOR RICHMOND AND
JILL JANETTE RICHMOND                                             DEFENDANTS

## MEMORANDUM OPINION

On September 6, 2007, James Victor Richmond (Vic) and Jill Janette Richmond

(Jill), the Debtors, filed a voluntary joint petition for relief under the provisions of Chapter 7

of the United States Bankruptcy Code.  On March 28, 2008, Southern Bancorp South,

formerly known as First Bank of the Delta, N.A.[1] (Bank), filed this adversary proceeding

against the Debtors objecting to the dischargeability of various debts owed to the Bank and

objecting to the discharge of both Vic and Jill.

Count I of the complaint objects to the dischargeability of debts owed by the Debtors

pursuant to the provisions of 11 U.S.C. § 523(a)(2)(A) on the grounds that the debts were

procured by false pretense, false representation, and actual fraud.  Count II objects to the

dischargeability of the Bank's debt pursuant to the provisions of 11 U.S.C. § 523(a)(2)(B)

---

[1] The Plaintiff has gone through a number of name changes over the last several years.
For purposes of this opinion, the Plaintiff shall be referred to as the "Bank."

1

because of the Debtors' use of some materially false financial statements.  Count III objects to the dischargeability of the Bank's debt pursuant to the provisions of 11 U.S.C. § 523(a)(4) for embezzlement or larceny of the Bank's collateral which was encumbered by a valid security interest.  Count IV objects to the dischargeability of the debt under the provisions of 11 U.S.C. § 523(a)(6) for willful and malicious injury to the Bank's property.  Also, in a separate paragraph in Count IV, the complaint adds an allegation, as an independent basis of liability of both Vic and Jill, based on fraud practiced on the Bank resulting in damages equal to the unpaid balances of the notes owed to the Bank by JSR & Co. and Richmond & Co.  The complaint asked for judgment against both Debtors, jointly and severally, for $3,483,181.38 plus accrued interest, costs, and attorney's fees, which sum represents the unpaid balance of nine separate notes.

On August 28, 2008, the Bank filed an amended complaint which added the following counts.  Count V alleges that the Debtors are the alter egos of their corporations, partnerships, limited liability companies, and other entities and, therefore, both Debtors are liable for all debts incurred by the fictitious entities owed to the Bank.  Count VI objects to the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(2) for transferring or concealing property with intent to hinder, delay, or defraud creditors.  Count VII objects to the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(3) because the Debtors failed to keep or preserve books and records from which their financial affairs might be ascertained.  Count VIII objects to the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(4) for knowingly and fraudulently, in connection with the case, making a false oath.  Count IX objects to the

Debtors' discharge pursuant to 11 U.S.C. § 727(a)(5) on the grounds that the Debtors failed to explain satisfactorily the loss or deficiency of assets to meet their liabilities.

The Debtors filed a timely answer to the complaint and the amended complaint denying the allegations.

Trial on the merits was conducted in Helena, Arkansas, on July 27, 28, and 29, 2009, and on September 29, 30, and October 1, 2009, after which the matter was taken under advisement. The parties have each filed post-trial briefs.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J) and the Court has jurisdiction to enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law pursuant to the Federal Rule of Bankruptcy Procedure 7052.

## SUMMARY

The Debtors are husband and wife who live in Phillips County, Arkansas, near Helena, Arkansas. They have farmed for 23 or 24 years. This particular case concerns the Debtors' farming activities in the calendar years 2006 and 2007. Although the Debtors owned only a small amount of farm land in 2006, they proposed to the Bank that they would farm 5,000 acres of rented land in Phillips County, Arkansas, (Phillips County) and a little more than 5,000 acres of rented land in Jefferson County, Arkansas, (Jefferson County) approximately 100 miles west of the Debtors' home. The crop to be produced in 2006 was all cotton. To accomplish this goal, two partnership entities were created by Vic to conduct the 2006 farming operations; JSR and Company (JSR & Co.) and Richmond and Company

(Richmond & Co.).  The debts involved were two crop production loans made in March and May of 2006, to the two entities created by Vic.  The loans were in the sum of $2,100,000.00 to JSR & Co.[2] and $2,050,000.00 to Richmond & Co.  The Bank is also owed indebtedness left over from previous farming activities by Vic and Jill, individually.[3]  The Debtors' farming businesses in 2006 included not only the production of the cotton crop, but also the operation of a cotton gin in Jefferson County and custom harvesting and hauling of cotton for other farmers by Richmond & Co. and JSR & Co.

In the early Spring of 2007, the Debtors notified the Bank by e-mail that JSR & Co. and Richmond & Co. would not be able to repay a substantial portion of either crop production loan, or any of the existing indebtedness, all of which totaled about $3,400,000.00.  The Debtors soon filed bankruptcy and this adversary proceeding followed.

## THE PARTIES

1.     Vic is one of the Co-Debtors.  He was in total control of the farming operation of both partnerships.  He also created all of the various entities involved.  (Tr. 9/29/09 at 76-77.)

2.     Jill is the other Co-Debtor and is married to Vic.  She did not testify at the trial of this matter.  Her apparent signature appears on the note and security agreement executed by JSR & Co., and her apparent signature appears on the personal guaranty of the

---

[2] JSR & Co. was loaned the additional sum of $250,000.00 in July 2006. (Pl. Ex. 22.)

[3] These debts will be discussed separately.

4

note executed by JSR & Co.[4]  (Pl. Ex. 20-23.)  She is the named managing partner of JSR & Co. and president of several of the corporate partners of JSR & Co.  Her apparent signature appears on many of the checks and other important documents in the case.  (Tr. 9/29/09 at 76 -77.)

       3.     JSR & Co. is a general partnership that borrowed $2,100,000.00 from the Bank to produce a 2006 cotton crop on land located in Phillips and Jefferson County.  JSR & Co. is a partnership made up of partners, all of which are corporations.  Jill is designated as the managing partner and the corporate partners are SJILL AG II, INC., Jill S. Richmond, President; LAURAJ AG II, INC., Jill S. Richmond, President; VCASE AG II, INC., Jill S. Richmond, President; ELIZ AG II, INC., Robert L. Easley, President; EHEATHER AG II, INC., Robert Easley, President; and EKATIE AG II, INC., Robert Easley, President.  (Pl. Ex. 19; Tr. 9/29/09 at 76.)   Vic is not a partner of JSR & Co. nor a shareholder of any of the corporate partners of JSR & Co.

       4.     Richmond & Co. is a general partnership that borrowed $2,050,000.00 from the Bank to produce a 2006 cotton crop on land located in Jefferson County.  Robert W. Richmond (Robert), Vic's father, is the named managing partner.  (Tr. 7/28/09 at 290.)   The partnership consists of eight partners, all of which are corporations.  The eight corporations are  PAULA AG, INC., Paula S. Knight, President; BILLB AG, INC., William M. Vangilder, President; BOBR AG, INC., Robert W. Richmond, President; RTAYLOR AG II,

---

[4] It is not possible to tell from the record when Jill signed her name or when Vic signed Jill's name. Vic testified that Jill knew he signed her name and had her full permission.

INC., John V. Richmond, President; KJIM AG II, INC., Paula S. Knight, President;

KPAULA AG II, INC, Paula S. Knight, President; VMONA AG II, INC., William M.

Vangilder, President; and VKEITH AG II, INC., William M. Vangilder, President. (Pl. Ex.

3.)  Robert personally guaranteed part of the debt of Richmond & Co. to the Bank.  Neither

Vic nor Jill is a partner of Richmond & Co. or a stockholder of any of the corporate partners

of Richmond & Co.

     5.     JSR, LLC is owned 80% by Jill and 20% by Laura Jill Richmond (Laura Jill),

the Debtors' college-aged daughter.  The primary purpose of this entity was to own

equipment used in the farming operation.  (Pl. Ex. 83; Tr. 7/28/09 at 295-296.)

     6.     JSR Farms is the name used to describe Jill, individually doing business as

JSR Farms.  JSR Farms purported to perform farming activities such as custom work,

cutting stalks, and plowing fields.  (Def. Ex. 8; Tr. 9/29/09 at 76.)

     7.     Richmond Gin, LLC (Richmond Gin), was originally owned 80% by Jill and

20% by Laura Jill.  (Pl. Ex. 120; Tr. 7/28/9 at 297.)  In January 2007, the ownership

percentage was changed to 25% Jill, 26% Vic, 24% Laura Jill, and 25% Case Richmond

(Case), the Debtors' high school-aged son.  (Pl. Ex. 121; Tr. 7/28/09 at 297.)  In 2006,

Richmond Gin conducted a cotton ginning business, module hauling, and custom cotton

harvesting.  In 2007, it did not conduct any ginning business but engaged in custom

harvesting and cotton hauling.  (Pl. Ex. 121; Tr. 7/28/09 at 297-298.)

     8.     DVFarm Group is a farm partnership made up of partners that are

corporations.  Vince Richmond (Vince), Vic's twin brother, was the named manager.

6

DVFarm Group farmed the same land Richmond & Co. farmed in 2006 in Jefferson County.
Vince borrowed the money to produce a crop in 2007.  Vic actually operated the farming
operation in 2007 and 2008 on behalf of FARMMGR, LLC (FARMMGR).  (Tr. 7/28/09 at
299-302.)

9.      RDFarm Group is a farm partnership made up of partners that are
corporations.  Jeff Davis (Davis), a friend of Vic's, financed the 2007 crop.  The named
manager of the partnership is Lane Easley.  RDFarm Group farmed the same land JSR &
Co. farmed in 2006 in Phillips County.  Vic actually operated the farming operation in 2007
and 2008 on behalf of FARMMGR.  (Tr. 7/28/09 at 300-302.)

10.      FARMMGR is a limited liability partnership created in 2007.  Vic testified
the partnership was owned 40% by Jill and Vic, and 60% by Laura Jill and Case.[5]  (Tr.
7/28/09 at 301.)  FARMMGR managed the farming operation in Jefferson County farmed
by DVFarm Group in 2007 and the farming operation in Phillips County farmed by RDFarm
Group in 2007 and 2008.  FARMMGR was paid approximately $10,000.00 a month in 2007
from DVFarm Group and $10,000.00 a month from RDFarm Group beginning in April
2007.  (Pl. Ex. 149.)  Vic is the named manager of FARMMGR.  (Tr. 7/28/09 at 302.)

## THE BANK ACCOUNTS

Vic had control of, made deposits to, and wrote checks on the following bank
accounts during 2006 and 2007:

---

[5] The bankruptcy petition lists ownership of FARMMGR as 18% and 22% owned by
"H," presumably H means the husband, Vic.  The Debtors' tax return for 2007 reflects Jill
owns 18% and Vic owns 22%.  (Tax Return 2007.)

1.      Richmond Gin, First National Bank of Eastern Arkansas, 2006. (Def. Ex. 11.)

2.      Richmond Gin, First National Bank of Altheimer, 2006.  (Def. Ex. 10.)

3.      JSR Farms, Helena National Bank, 2006.[6]  (Def. Ex. 8.)

4.      Richmond & Co., Helena National Bank, 2006. (Def. Ex. 14.)

5.      Richmond & Co., Texas State Bank, 2006.  (Def. Ex. 15.)

6.      Richmond & Co., First National Bank of Altheimer, 2006.  (Def. Ex. 13.)

7.      Richmond & Co., First Bank of the Delta, 2006. (Def. Ex. 12.)

8.      JSR & Co., First Bank of the Delta, 2006.  (Def. Ex. 9.)

9.      RDFarm Group, Citizens Deposit Bank, KY, 2007.  (Pl. Ex. 86.)

10.     RDFarm Group, First National Bank of Eastern Arkansas, 2007.  (Pl. Ex. 88.)

11.     DVFarm Group, Bank of America, 2007.  (Pl. Ex. 89.)

12.     DVFarm Group, First National Bank of Eastern Arkansas, 2007.  (Pl. Ex. 92.)

13.     FARMMGR, Bank of America, 2008 (Pl. Ex. 150.)

14.     FARMMGR, First National Bank of Eastern Arkansas, 2007-2008 (Pl. Ex. 148 & 149.)

15.     Jill's personal account, First National Bank of Eastern Arkansas, 2007.[7]  (Pl. Ex. 145.)

## LOAN TO RICHMOND & CO.

Richmond & Co. made a formal application for a crop loan from the Bank in the

---

[6] Jill also used this account.

[7] Jill also used this account.

8

amount of $2,050,000.00 for the crop year 2006.  (Pl. Ex. 1 & 2; Tr. 9/29/09 at 97-99.)  Vic, on behalf of Richmond & Co., represented to the Bank it intended to grow cotton crops on land rented from Leroy Donley (Donley) and Prudential consisting of 5,253 acres in Jefferson County and use the loan proceeds for that purpose.[8]  (Pl. Ex. 1 & 2; Tr. 9/29/09 at 103-104.)  Cash rent was projected to be a total of $464,050.00.  (Pl. Ex. 2.)   The loan was to be made to Richmond & Co. and guaranteed individually by Robert.  (Pl. Ex. 1 & 2.)  Vic said the reason he held no ownership interest in Richmond & Co. was that "my credit wasn't any good."  (Tr. 7/28/09 at 290-292.)  Robert signed the loan application; however, Vic stated he handled most of the work putting together the loan application.  (Pl. Ex. 2; Tr. 7/28/09 at 304, 306, 309, & 318.)

In connection with the loan application, Vic submitted a balance sheet for Richmond & Co.  (Tr. 7/28/09 at 310-311.)  The balance sheet indicated farm equity of $472,825.00 and indicated that Richmond & Co. owned no equipment.  (Pl. Ex. 1.)  Vic prepared a substantial proportion of the financial statement for Robert, which Robert signed.  (Tr. 7/28/09 at 309 & 311.)  The financial statement indicated Robert had a $1,093,775.00 farm equity net worth.  (Pl. Ex. 14.)

The loan officer who presented the loan and worked with Vic to prepare the necessary documents was Nancy Corder (Corder).  (Tr. 9/29/09 at 96; Pl. Ex. 1.)  Corder had a long-term banking relationship with the Richmond family and Vic in particular.  (Tr. 7/29/09 at 630-631.)  In fact, Corder's son is married to Jill's sister.  (Tr. 9/29/09 at 193.)

---

[8] Richmond & Co. actually planted 5,660 acres in Jefferson County.  (Pl.'s Ex. 36; Tr. 7/28/09 at 369.)

The loan committee for the Bank approved the loan, with the condition that before any advance could be drawn from the 2006 crop loan, the existing balance of $528,101.81 from the 2005 crop loan had to be paid.  This requirement was discussed with Vic who testified that he understood and agreed with this requirement.  (Tr. 7/28/09 at 306; Tr. 9/29/09 at 98-99; Pl. Ex. 1.)  Vic discussed the crop production application with Corder and she stated she did not tell him anything different from what was written on the credit application.  (Tr. 9/29/09 at 99.)  The Bank was fully aware that Vic was not personally liable to repay the 2006 crop loan made to Richmond & Co.

The loan was evidenced by two notes.  The first note dated March 31, 2006, was in the principal sum of $1,230,000.00.  (Pl. Ex. 2; Tr. 7/28/09 at 322-323.)  The note was signed by Robert as manager of Richmond & Co. and in his individual capacity and by the presidents of the eight corporate partners.  (Pl. Ex. 3.)   To secure repayment of the note, a security agreement was executed, which granted the Bank a security interest in:

> All Accounts, General Intangibles, Crops and Farm Products
>
> All Crops/Farm Products of every kind and description, stored or harvested, planted or growing, or to be planted or grown on the real estate described on Exhibit "A" attached hereto, and made a permanent part hereof.
>
> Assignment of Custom Harvesting and Hauling.

(Pl. Ex. 4.) [9]

---

[9] The signature page was not attached to Plaintiff's Exhibit 4. There was testimony that Plaintiff's Exhibit 7 had two signature pages and one belonged to Plaintiff's Exhibit 4; however, the Court concludes that this cannot be correct. The alleged extra signature page does not follow the page numbers found on the Exhibit 4, rather it is a part of Exhibit 7 and follows Exhibit 7's pagination.  (See Tr. 9/29/09 at 117-118.)

10

Vic testified that he read the security agreement and loan proposal but stated that although he was aware of the security interest in crops, "I actually was not aware of the custom harvesting and hauling lien, as such, as to where they wanted their name on it.  No, sir.  I was not.  That wasn't what we discussed."  (Tr. 7/28/09 at 326.)  After agreeing that the loan documents provided otherwise, Vic stated:

> My conversations were that we generated custom harvesting to be used to aid this crop loan right here, and not to ever be used for repayments.  We had to have that money to generate the farm.  So my understanding and my knowledge of this document, yes, I agree with what you're asking, but, no, as far as my interpretation and as far as what was presented that I was aware of, that the government – I mean, the custom hire money was not to be used as a form of repayment ever, nor had it ever been previously, many years.

(Tr. 7/28/09 at 327.)

The second note dated the same date as the first note is in the principal sum of $820,000.00.  (Pl. Ex. 6; Tr. 7/28/09 at 330-331.)  This note was signed by Robert as managing partner of Richmond & Co. and the presidents of all of the corporate partners. (Pl. Ex. 6.)  The note was secured by a security agreement with the same language as the first security agreement, but added "and Farm Equipment of Robert W. Richmond." (Pl. Ex. 4 & 7.)  The Bank also obtained an assignment of FSA payments from the United States and payable to Richmond & Co.  (Pl. Ex. 8; Tr. 7/28/09 at 332.)  The second note was not guaranteed by Robert, individually, as intended, which was an oversight of the Bank.  (Pl. Ex. 6; Tr. 9/29/09 at 114-115.)  The security agreement was signed by Robert as manager of Richmond & Co. and individually and was signed by the presidents of the eight corporate partners. (Pl. Ex. 7.)

11

Corder testified that she allowed all of the loan documents to be taken from the Bank and that they were returned executed. (Tr. 9/29/09 at 113-114.) A financing statement perfecting the Bank's security interest was filed in Phillips County on April 20, 2006. (Pl. Ex. 11; Tr. 7/28/09 at 334-335.)

On March 31, 2006, Richmond & Co. made its first draw on the 2006 crop loan in the sum of $600,000.00. (Def. Ex. 12.) Immediately upon receiving the crop loan proceeds, Vic performed a complicated check kite scheme to hide the fact that he was paying the balance of the 2005 crop loan owed to the Bank by Richmond & Co. with the proceeds of the 2006 crop loan. The Debtors concede that the check kite scheme occurred. (Def.'s Post Trial Brief at 50.) All transfers were made on the same day, March 31, 2006, and were as follows:

1.     $45,000.00 was deposited to the Richmond & Co. account at the Bank from Richmond & Co.'s account at Helena National Bank. (Def. Ex. 12 & 14.)

2.     $496,258.27 was deposited to Richmond & Co.'s account at the Bank from the Richmond Gin Account at First National Bank of Altheimer. (Def. Ex. 10 & 12.)

3.     The $600,000.000 loan proceeds were deposited to the Richmond & Co. account at the Bank. (Def. Ex. 12.)

4.     A payment of $80,719.14 interest for the 2005 crop loan for Richmond & Co. was drawn on the account at the Bank. (Def. Ex. 12.)

5.     A payment of $448,289.00 principal due for the 2005 crop loan for Richmond & Co. was drawn on the account at the Bank. (Def. Ex. 12.)

12

6.      $490,000.00 was transferred from Richmond & Co.'s account at the Bank to Richmond & Co.'s account at Helena National Bank.  (Def. Ex. 12 & 14.)

7.      $496,367.22 was transferred from Richmond & Co.'s account at Helena National Bank to Richmond Gin's account at the First National Bank of Altheimer.  (Def. Ex. 10 & 14.)

These checks were signed by Paula Knight (Knight) at Vic's direction.  (Tr. 7/28/09 at 246-247, 252; Pl. Ex. 129.)  Knight is the bookkeeper/secretary for Richmond & Co., JSR & Co., and Richmond Gin.  She is paid one-third of her salary from each.  (Tr. 7/28/09 at 227.)  By this check kite, Vic pretended to pay Richmond & Co.'s 2005 crop loan with an inter-company loan from Richmond Gin, but actually paid the 2005 crop loan in the total sum of $529,008.14 with proceeds from the 2006 crop loan in direct violation of the loan agreement with the Bank.  (Pl. Ex. 130.)

Richmond & Co. made a $200,000.00 draw on April 3, 2006, and another $500,000.00 draw on April 6, 2006, which was immediately used up to make a $517,005.25 payment to Helena Chemical Company on April 5, 2006, to pay the balance owed by Richmond & Co. on the 2005 crop debt.[10]  (Def. Ex. 12.)  So by April 19, 2006, Richmond & Co. had already used up $1,771,013.30 of its total 2006 crop loan of $2,050,000.00 before

---

[10] Richmond & Co. also loaned JSR & Co. $725,000.00 on April 18, 2006, to pay its 2005 debt to Helena Chemical Company.  (Tr. 7/29/09 at 656; Def. Ex. 9 & 12.)

13

spending one dime to produce the 2006 crop.[11]

At the conclusion of the 2006 crop season and after crediting all payments on the

crop loans, Richmond & Co. still owed the Bank the following:

1.    $849,469.64 (including interest as of 7/22/09)

2.    $ 71,459.10 (interest only as of 7/22/09)

TOTAL:    $920,928.74

(Pl. Ex. 60; Tr. 9/29/09 at 155-156).

## LOAN TO JSR & CO.

The other crop loan made in 2006 by the Bank was made to JSR & Co.  The loan

request was for $2,100,000.00.  (Pl. Ex. 17.)  The application was prepared from

information provided by Vic.  He proposed that JSR & Co. would plant cotton on 2,159

rented acres in Jefferson County and 3,024 rented acres in Phillips County for a total of

5,183 acres.  The collateral on the loan application was listed as crops, farm equipment, crop

insurance, assignment of custom and module hauling (of cotton), and FSA payments. (Pl.

Ex. 17.)  The loan officer for the Bank who presented the loan to the bank loan committee

was Corder.

Like the Richmond & Co. loan, this loan was evidenced by two notes.  The first note

was in the principal sum of $1,260,000.00, executed by JSR & Co.  (Pl. Ex. 19.)  This note

---

[11] $1,771,013.30 is arrived at by adding: $80,719.14 (interest payment to Bank for 2005 loan to Richmond & Co.); $448,289.00 (principal payment to Bank for 2005 loan to Richmond & Co.); $517,005.25 (Richmond & Co.'s debt to Helena Chemical Co. from 2005); and $725,000.00 (loan to JSR & Co. so JSR & Co. could repay their debt to Helena Chemical Co. from 2005).

14

was dated May 1, 2006, and bore the alleged signatures of Jill, Manager of JSR & Co., and Jill, individually.  A security agreement was executed by JSR & Co. under the signature of Jill.[12]  (Pl. Ex. 20; Tr. 7/28/09 at 353.)  The security agreement granted a security interest to the Bank in "[a]ll Crops/Farm Products of every kind and description, stored or harvested, planted or growing, or to be planted or grown on the real estate described on Exhibit 'A' attached hereto, and made a permanent part hereof.  All Accounts, General Intangibles, Crops and Farm products."  (Pl. Ex. 20.)  Exhibit A attached to the security agreement contained a list of farms where the cotton crop was to be grown and cryptic legal descriptions containing the section number, township and range number, name of the county, and the farm number.  It referred to 2,159 acres in Jefferson County on a farm owned by Donley.  (Pl. Ex. 20.)  The same description was used on the Richmond & Co. application with respect to the Donley land in Jefferson County except the Richmond & Co. application contained 3,380 acres and the JSR & Co. application contained 2,159 acres. (Pl. Ex. 2 & 20.)   The record does not reflect if these are two different farms or the same farm on the loan applications, although both have the same farm number and owner.  Vic admitted that JSR & Co. did not plant or raise any cotton in Jefferson County in 2006.[13]  (Tr. 7/28/09 at 354.)  The record reflects only 3,199 acres of land were certified as planted with

---

[12] The signature page of the security agreement was missing from Plaintiff's Exhibit 20. The parties, however, do not dispute that the signature of Jill should be attached. Vic claims he signed Jill's name on the agreement with Jill's knowledge.

[13] Vic later changed his testimony, saying that 5,000 acres were planted by JSR, including some in Jefferson County. (Tr. 7/28/09 at 370-371.) The Court does not find this testimony credible and it does not warrant a discussion.

cotton in Phillips County by JSR & Co. (Tr. 7/28/09 at 365, 388; Pl. Ex. 55.)

The second note was in the principal sum of $840,000.00, also executed on May 1, 2006, and has the purported signature of Jill, manager of JSR & Co., and Jill, individually. (Pl. Ex. 21.)  A third note, not executed until July 19, 2006, was in the principal sum of $250,000.00, and also has Jill's purported signature as the manager and individually.  (Pl. Ex. 22.)  A security agreement bearing Jill's name as manager of JSR & Co. and Jill individually, made on the same day as the $250,000.00 note, granted to the Bank a security interest in:

> All Accounts, General Intangibles, Crops, Farm Products and all Farm Equipment owned by Jill S. Richmond, d/b/a JSR Farms, (described in two Agricultural Security Agreements dated May 1, 2006, and UCC-1, filing number 2006-366, filed in Phillips County, AR on the 10th day of May 2006, UCC-1, filing number 2006-375, filed in Phillips County on the 15th day of May 2006, UCC-1, filing number 109304, filed in Jefferson County, AR on the 12th day of May 2006, UCC-1, filing number 109306, filed in Jefferson County on the 17th day of May 2006, and two UCC-1(s), filing number 7128415633 and number 7128415562, filed in the State of Arkansas on the 12th day of May 2006), Assignment of FSA Payments dated May 1, 2006, Assignment of Crop Insurance dated May 1, 2006, and Assignment of custom harvesting and module hauling dated May 1, 2006, all of which are incorporated herein and made a permanent part hereof.

(Pl. Ex. 23.) [14]  As in the case of the crop loan to Richmond & Co., the Bank was fully aware Vic was not personally liable to repay the 2006 crop loan made to JSR & Co.

Vic submitted a list of farm equipment that he represented was owned by Jill.  (Pl. Ex. 17.)  The Bank duly perfected its security agreements executed on May 1, 2006, by

---

[14] The Court notes that there is no security agreement in the record that corresponds with Plaintiff's Exhibit 21, the $850,000.00 note. However, as the language of Plaintiff's Exhibit 23 demonstrates, the $850,000.00 note is incorporated by this security agreement.

filing a financing statement with the Circuit Clerk of Phillips County on July 25, 2006.  (Pl. Ex. 28.)

Vic testified he signed his wife's name to her financial statement, the promissory note for $1.26 million by JSR & Co., and JSR & Co.'s security agreements. (Tr. 7/28/09 at 346, 352, & 353.)  He testified that he was authorized by her to sign on her behalf. (Tr. 7/28/09 at 344.)  Vic claims Jill's signature should not be on the $840,000.00 note because the note was replaced with a different note in which Jill was not personally liable.[15]   (Tr. 7/28/09 at 355-357.)

On May 1, 2006, the Bank deposited the first draw for the 2006 crop loan in the sum of $1,260,000.00 to JSR & Co.'s account at the Bank.  (Def. Ex. 9.)  Immediately upon receiving the first draw of the 2006 crop loan, Vic performed another check kite scheme in connection with the 2006 crop loan to JSR & Co., similar to the one he concocted in connection with the loan to Richmond & Co., to hide the fact that he was paying JSR & Co.'s 2005 crop loan with JSR's 2006 crop loan proceeds in violation of the loan agreement. The kite occurred as follows:

1.	On April 28, 2006, Vic caused two checks, one for $508,521.58 and the other for $272,849.22 drawn on the Richmond Gin account at First National Bank of Altheimer, to be deposited to JSR & Co.'s account at the Bank.  (Pl. Ex. 128; Def. Ex. 9 & 10.)

2.	On April 28, 2006, Vic caused JSR & Co. to transfer from its account at the Bank the sum of $811,284.40 payable to the Bank in payment of the 2005 crop loan. (Def.

---

[15] This testimony makes no sense and was never explained later in the record. The $840,000.00 note was admitted into evidence by stipulation of the parties.

Ex. 9.)

3.     On April 28, 2006, Vic caused JSR & Co. to transfer to the Richmond Gin account at First National Bank of Altheimer two checks, one for $508,632.67 and the other for $272,909.03.  (Pl. Ex. 129; Def. Ex. 9 & 10.)

Previously, on April 5, 2006, JSR & Co. paid Helena Chemical Co. $770,004.11 for the unpaid balance of the 2005 crop year. (Def. Ex. 9.)  The JSR & Co. account remained overdrawn by more than $700,000.00 from April 4, 2006 to April 19, 2006. (Def. Ex. 9.) On  April 19, 2006, Richmond and Co. lent $725,000.00 to JSR & Co.  (Def. Ex. 9 & 12.) This money came from Richmond and Co.'s draw on its 2006 crop loan at the Bank. (Tr. 7/29/09 at 653; Def. Ex. 9 & 12.)

Therefore, by May 25, 2006, JSR & Co. had drawn a total of $1,860,000.00 of its $2,100,000.00 crop loan and was overdrawn at the Bank at the end of the day, May 25, 2006, by $213,326.80.  (Def. Ex. 9.)  JSR & Co.'s account at the Bank remained overdrawn until June 8, 2006, when it received another $200,000.00 draw on its crop loan.

After JSR & Co. and Jill had made payment on the 2006 crop loan, the Bank is still owed the following:

1.     Note in the original principal amount of $1,260,000.00.  The balance still due as of July 27, 2009, in the sum of $859,275.22;

2.     Note in the original principal amount of $840,000.00.  The balance due as of July 27, 2009, is the sum of $978,548.31;

3.     Note in the original principal amount of $250,000.00.  The balance due as of

July 27, 2009, is $318,647.50.  (Pl. Ex. 60.)

The notes, including crop production loans to JSR & Co., guaranteed by Jill, equal a total unpaid balance of $2,156,471.00 as of July 27, 2009.  (Pl. Ex. 60; Tr. 9/29/9 at 156 - 157.)

## VIC AND JILL'S PERSONAL INDEBTEDNESS

Four unpaid debts are owed by Vic and Jill personally to the Bank which were not in connection with the 2006 crop loan for which liability is not disputed by the Debtors as follows:

1. Note dated 5/30/02 owed by Vic - balance due $110,230.59

2. Note dated 5/30/02 owed jointly by Vic and Jill - balance due $184,838.89

3. Note dated 7/16/04 owed by JSR, LLC and Jill - balance due $170,935.55

4. Note dated 7/16/04 owed by Vic - unknown balance due. [16]

(Pl. Ex. 51, 60, & 144.)

## I.

## ALTER EGO AS THE BASIS OF LIABILITY

The Bank claims that Vic is personally liable for the unpaid crop loans made to JSR & Co. and Richmond & Co.  The complaint specifically alleges the following:

Debtors used corporations, partnerships, limited liability companies and other fictitious entities in an effort to avoid their joint personal accountability and

---

[16] The Plaintiff did not introduce sufficient evidence from which the Court can compute the unpaid principal balance due on this note dated 7/16/04.  The Plaintiff's brief used inconsistent numbers ($219,477.52 & $217,647.15) and the calculations are not supported by the record. Therefore, the Court will not enter a judgment on any alleged unpaid balance due on this note.

liability for the consequences of their joint actions described in the Second Amended Complaint.  Debtors are personally liable because of this personal conduct and, in addition, Debtors were the de facto owners, operators, managers and beneficiaries of the sham entities, including JSR & Company, Richmond & Company, JSR, LLC, and Richmond Gin, LLC, which were shells created for and used by Debtors for the express purpose of defrauding [the Bank] and other creditors, all as alleged in Counts I through IV. This Court should disregard the corporate or other entity veils and hold Debtors personally accountable and liable to [the Bank] for the loans they procured in entity names and for damages incurred by [the Bank] as a direct result of Debtors' actions.

In certain circumstances, a court will disregard the corporate facade when the corporate form has been illegally abused to the injury of a third party.  K.C. Properties of N.W. Arkansas, Inc. v. Lowell Investment Partners, LLC, 373 Ark. 14, 32, 280 S.W.3d 1,15 (2008)(citations omitted).  When a corporate form is challenged, "the real basis of liability is actual control and manipulation of the other, whether that control and manipulation be exercised by virtue of stock ownership or otherwise."  Constellation Development Corp. v. Dowden (In re B.J. McAdams, Inc.), 66 F.3d 931, 937 (8th Cir. 1995)(quoting Henderson v. Rounds & Porter Lumber Co., 99 F. Supp. 376 (W.D. Ark. 1951)).  The Court of Appeals further stated that:

> Under the alter ego doctrine, the legal fiction of the separate corporate entity may be rejected in the case of a corporation that (1) is controlled by another to the extent that it has independent existence in form only, and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud.

In re B. J. McAdams, Inc., 66 Fd.3d at 937 (citing Lakota Girl Scout Council, Inc. v. Harvey Fund-Raising Mgmt., Inc., 519 F.2d 634, 638 (8th Cir. 1975)).  The alter ego doctrine rarely arises in the context of partnerships because partners are liable for the debts of the general

20

partnership. "Under the alter ego theory, courts disregard the corporate entity when there exists such unity between the corporation and the individual that the corporation ceases to be separate and when holding only the corporation liable would promote injustice." Elizabeth S. Miller, Are There Limits on Limited Liability? Owner Liability Protection and Piercing the Veil of Texas Business Entities, 43 Tex. J. Bus. L. 405, 406 (2009). In general, most cases involving piercing of a corporate veil are premised on the alter ego theory. Id.

"The concept of distinct corporate entity has long served useful business purposes, encouraging risk taking by individual investors as well as overall convenience of financial administration. Ordinarily, such considerations justify treating the corporation as a separate entity, independent of its owner. On occasion, however, the concept is abused, and yields results contrary to the interests of equity or justice. Courts have not hesitated to ignore the fiction of separateness and approve a piercing of the corporate veil when the corporate device frustrates clear intendment of the law." Valley Financing, Inc. v. U.S., 629 F.2d 162, 171 (C.A.D.C. 1980)(citations omitted). See also Loving Saviour Church v. U.S., 556 F.Supp. 688 (D.S.D. 1983) (the court disregarded title of property in the name of a church to satisfy individual taxpayer's tax liability).

There are cases where the partnership entity is disregarded in order to seize property titled in the partnership but actually owned by the individual partner to satisfy a debt owed by the partner. See U.S. v. Scherping, 187 F.3d 796, 801 (8th Cir. 1999)(the government may collect the tax debt of a taxpayer from assets of the taxpayer nominee, instrumentality or alter ego through reverse piercing); Seaver v. Burwell Family Limited Partnership and

21

RHFP, LLC (In re Burwell), 391 B.R. 831 (B.A.P. 8th Cir. 2008);  Martinson v. Town (In re Towe), 173 B.R. 217 (Bankr. D.Mont. 1994).

However, in this case the Bank's theory of alter ego has no application because there is no veil, corporate or partnership, to pierce to fix liability on Vic.  He has no ownership interest in JSR & Co. or Richmond & Co.  These two entities are partnerships and the partners are liable for all partnership debts.  Ark. Code Ann. § 4-46-306(a)(Michie 2001); Curlee Clothing Co. v. Hamm, 160 Ark. 483, 254 S.W. 818 (1923).  Vic is not an owner of any interest in the corporate partners through which he is shielding his assets.  No case is cited by the Bank that supports the theory advanced that Vic is liable for partnership debts because he controlled the partnership with the acquiescence of the partners.  Independent research by the Court has failed to uncover any case which stands for that proposition.

The Bank seeks to make Vic a partner because he controlled the partnership. Pursuant to Arkansas Code Annotated § 4-46-308, a person may be considered a partner and held liable for partnership debt if the person entering into the transaction with the purported partner relied on the representation the person was a partner.  In this case, the Bank knew from the beginning that Vic was not a partner and was not personally liable to the Bank for repayment of the 2006 crop loan of JSR & Co. and Richmond & Co.  With full knowledge of this fact, the Bank was willing to accept this risk and look to the partnership, Jill, and Robert for repayment.

Therefore, on this record, Vic is not personally liable to the Bank for the unpaid balance of the 2006 crop loan to JSR & Co. and Richmond & Co. based on the alter ego

22

theory.

Jill personally guaranteed the repayment of the 2006 crop loan to JSR & Co. to the Bank.  The evidence is undisputed that she owes the following:

1.      Note dated 5/1/06 - balance due $859,275.22

2.      Note dated 5/11/06 - balance due $978,548.31

3.      Note dated 5/11/05 - balance due $318,647.50

(Pl. Ex. 60.)

For the same reasons stated previously about Vic's personal liability, Jill is not liable for the unpaid balance of the 2006 crop loan owed by Richmond & Co. based on the alter ego theory.  In addition to the inapplicability of the theory advanced by the Bank as to Jill's liability, there was absolutely no evidence of any control she had over any of the partnerships which would serve as a foundation to impose liability.

## II.

## **FRAUD AS A BASIS OF LIABILITY**

The complaint made the allegation that the Bank has been defrauded by both Vic and Jill and that the damage equaled the unpaid balance of the notes made in the name of JSR &

Co. and Richmond & Co.[17]

The Eighth Circuit Court of Appeals has ruled that under Arkansas law, the tort of fraud, misrepresentation, or deceit consists of five elements:

> (1) a false representation of a material fact; (2) knowledge that the representation is false, or an assertion of fact which he or she does not know to be true; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damages suffered as a result of the reliance. Grendell v. Kiehl, 291 Ark. 228, 230, 723 S.W.2d 830, 832 (1987).

Morrison v. Back Yard Burgers, Inc., 91 F.3d 1184, 1186 (8th Cir. 1996).  See also Delta School of Commerce, Inc. v. Wood, 298 Ark. 195, 198, 766 S.W.2d 424, 425 (1989); Stine v. Sanders, 66 Ark. App. 49, 53, 987 S.W.2d 289, 292 (1999).  The burden of proof in an action for fraud is by the preponderance of the evidence.  Grendell v. Kiehl, 291 Ark. 228, 230, 723 S.W.2d 830, 831-832 (1987); Ray Dodge, Inc. v. Moore, 251 Ark. 1036, 1041, 479 S.W.2d 518, 521 (1972).

Fraudulent intent may be derived from circumstantial evidence. The Eighth Circuit has explained that the court should focus on whether the debtor's actions "appear so inconsistent with [his] self serving statement of intent that the proof leads the court to disbelieve the debtor."  Matter of Bank Horne, 823 F.2d 1285, 1288 (8th Cir. 1987).

---

[17] The complaint did not plead fraud as a basis for liability with specificity as required by Rule 7009; however, the Debtors made no objection to the pleadings and evidence of fraud was admitted without objection.  The Court may, and will in this case, permit the pleadings to be amended to conform to the proof when issues are tried by implied consent.  Fed. R. Bankr. P. 7015(b)(2); Smith v. Cooper (In re Cooper), 399 B.R. 637, 645 (Bankr. E.D. Ark. 2009)(citing Ehrichs v. Kearney, 730 F.2d 1170, 1172(8th Cir. 1984); In re Barton, 869, 875 (Bankr. N.D. Ohio 2004); In re Lett, 238 B.R.167, 188 (Bankr. W.D. Mo. 1999)); see also In re Advance, 257 B.R. 457, 462 (Bankr. E.D. La. 2001).

In Arkansas, reliance need only be justifiable as opposed to reasonable.  See Field v. Mans, 516 U.S. 59, 73, 116 S.Ct. 437, 445 n.12 (1995)(citing Fausett & Co. v. Bullard, 217 Ark. 176, 179-180, 229 S.W.2d 490, 491-492 (1950)).  Justifiable reliance means that a person may rely on a representation of fact even though he could ascertain the falsity of the representation if he made an investigation.  Field v. Mans, 516 U.S. at 73, 116 S.Ct. at 444.  Contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort.  Field v. Mans, 516 U.S. at 73, 116 S.Ct. at 445.  A duty to investigate is only required where, under the circumstances, the facts should be obvious to someone of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived.  Field v. Mans, 516 U.S. at 71, 116 S.Ct. at 444;  Larry Treadwell v. Glenstone Lodge, Inc. (In re Treadwell), 423 B.R. 309, 315 (B.A.P. 8th Cir. 2010.)  The benefit of the doubt is given to the victim, even if the victim was careless or could have been more diligent and conducted an investigation.  In re Treadwell, 423 B.R. at 315 (citations omitted).

Vic was required to pay the balance of the 2005 crop loan owed by JSR & Co. and Richmond & Co. to the Bank as a condition before he could draw the 2006 loan. He was also required by Helena Chemical Company to pay Helena Chemical Company the 2005 unpaid balance due in order to receive credit for product to be used to produce a 2006 crop. Vic committed fraud on the Bank when he represented, on behalf of both JSR & Co. and Richmond & Co., that the 2006 crop loan proceeds would be used to produce a cotton crop in 2006 in Phillips and Jefferson County in order to get the loan.

Immediately upon receiving the loan proceeds, first for Richmond & Co. and then for JSR & Co., Vic used the loan proceeds to pay the balance of the 2005 crop loan owed to the Bank in the sum of $529,008.41 for Richmond & Co. on March 31, 2006, and the sum of $811,284.40 for JSR & Co. on April 28, 2006. (Pl. Ex. 130 & 131.) Vic also caused JSR & Co. to pay from the 2006 crop loan proceeds the debt owed for the 2005 crop year to Helena Chemical Company in the sum of $770,004.11 and a debt owed by Richmond & Co. to Helena Chemical Company for the 2005 crop year in the sum of $517,005.25. (Pl. Ex. 130 & 131.) All of these payments were in direct violation of the terms of the loan agreements. Vic performed a check kite, as discussed previously, to deceive the Bank and make it appear that Richmond Gin was the source of the funds to pay the 2005 debts to the Bank and Helena Chemical Company. The fact that Vic immediately used the loan proceeds to pay off the 2005 loan leaves no doubt that Vic knew his representation to the Bank was false when he made it. Vic knew he had no money to accomplish the 2006 loan requirements.

The bank president, James Boyd (Boyd), said the Bank relied on the loan package submitted to the Bank. (Tr. 9/30/09 at 172.) Corder testified that in all of her past dealing with Vic, she never found him to be deceptive. (Tr. 9/30/09 at 4.) According to Corder, Vic told her that Richmond Gin was going to lend JSR & Co. and Richmond & Co. the money to pay off the 2005 and she believed him. (Tr. 9/30/09 at 115 & 125.) Vic told Corder that he would be able to pay back Richmond Gin with crop proceeds from the 2005 unsold crop. (Tr. 9/29/09 at 203.) Corder stated that if she had known that Vic was going to pay the 2005 crop balance with the 2006 loan, she would have not advanced the credit. (Tr. 9/30/09 at

26

116.)  The Bank reasonably relied upon Vic's representation based on their long term business relationship.

Vic argues that paying the 2005 crop loan with the 2006 crop loan was acceptable to the Bank because "he had previously informed Ms. Corder of his intentions."  (Def. Post-Trial Brief at 15; Tr. 7/29/09 at 644, 654, & 662).  He claims the Bank knew what was going on the entire time.  (Tr. 7/29/09 at 654.)  However, no one at the Bank, including Corder, testified that they knew or that it was acceptable.  Furthermore, the Bank's loan committee specifically prohibited this action in writing, as Vic well knew.  In fact, no one but Vic testified that it was agreeable with the Bank that he use the 2006 crop loan to pay debts remaining for the 2005 crop year.

Boyd testified that he arranged a meeting with Vic at a restaurant in Helena to talk about the loan when it was brought to his attention that 60 percent of the loan to JSR & Co. had been withdrawn almost immediately.  (Tr. 9/30/09 at 169.)  Boyd said he wanted to make sure the 2006 loan was not used to pay the 2005 loan balance and he was assured by Vic that Richmond Gin had the funds to pay the 2005 crop balance.  (Tr. 9/30/09 at 170.) Vic described his version about the meeting with Boyd as follows:

> [T]hey said that it could have appeared that we used '06 funds to pay out the '05 crop loan, and that in the future when the - - if - - if future loans were closed from crop loans, that they would want to do, on the next time, would be to make a separate loan against whatever balance was from the previous year, and make that happen in a separate loan with a separate pay out, and then be able to advance that future crop loan's loan.  Basically, end of story. "What do you want for lunch?"  We had lunch.  I even think they bought my lunch that day.  And then we left.  And that's end of story . . . .

(Tr. 7/29/09 at 651.)

This testimony hardly supports Vic's argument that he told the Bank officer what he had done and received their approval.  If Vic thought what he did was permissible and approved by the Bank, there would have been no need to go to such extraordinary means of deception by creating two check kites to make it appear that the funds were coming from Richmond Gin.  When combined, $ 2.6 million of JSR & Co. and Richmond & Co.'s 2006 crop loan was used to pay the 2005 debt.  JSR & Co. and Richmond & Co. were, therefore, left with inadequate funds to produce the 2006 crop based on Vic's own projections.  No bank would have been foolish enough to agree to such a scheme.  Vic's testimony in this regard is rejected as false.

The Debtors seem to argue in their brief that the Bank is to blame because they did not detect Vic's fraud soon enough.  True, there is evidence that the Bank officers were careless in handling these loans.  The loan documents should never have left the Bank to be executed outside the presence of a bank officer.  The initial draws for both JSR & Co. and Richmond & Co. occurred before the Bank recorded its financing statement.  (Pl. Ex. 28; Def. Ex. 8.)  The Bank probably regrets not looking at JSR & Co.'s bank account to fully understand what was happening when the first draw was made and the meeting at the restaurant in Helena occurred.  With hindsight, the Bank made a bad business decision in accepting Vic's explanations; however, this does not rise to the level of an obvious red flag. The Bank justifiably relied on Vic's statements.

The diversion of the crop loans by Vic made full repayment of the 2006 crop loan impossible and directly caused the damages suffered by the Bank in the form of the unpaid

28

balances. The Bank suffered a tremendous loss as a result of relying on his fraudulent promise.  Vic is therefore liable for all unpaid debts of JSR & Co. and Richmond & Co. because he committed a fraud on the Bank.

The evidence regarding Jill's liability, however, does not justify a judgment based on fraud for the unpaid balance of the crop loan to Richmond & Co.  She is already liable for the unpaid balance owed by JSR & Co.  The Bank has not proved that she participated in the false representation, the diversion of funds, or the check kite.

### III.

### 11 U.S.C. § 523(a)(2)(A)
### FRAUD

The Bank alleges that both Vic and Jill's debt owed to the Bank arising out of the crop loan made in 2006 in the name of JSR & Co. and Richmond & Co. should excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). That Code Section provides:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
>     (2)    for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by -
>         (A)    false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A)(2006).

False pretense deals with implied misrepresenting or conduct intended to create and foster a false impression, as distinguished from a false representation which is an express misrepresentation.  WebMD Practice Services v. Sedlacek (In re Sedlacek), 327 B.R. 872, 887 (Bankr. E.D. Tenn. 2005).  Actual fraud involves "any deceit, artifice, trick, or design

29

involving direct and active operation of the mind, used to circumvent and cheat another-something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." Id.

To prevail in a section 523(a)(2)(A) objection for fraud, a creditor must prove five elements: (1) the debtor made a representation; (2) the debtor knew the representation to be false at the time; (3) the debtor intended to deceive the creditor or to induce him to act upon the representation; (4) the creditor justifiably relied on such representation; and (5) the creditor was damaged as the proximate result of the representations being made  R & R Ready Mix v. Freir (In re Freir), 2010 WL 183 (8th Cir. 2010); Thul v. Ophaug (In re Ophaug), 827 F.2d 340, 342 (8th Cir. 1987); Fee v. Eccles (In re Eccles), 407 B.R. 338, 342 (B.A.P. 8th Cir. 2009); Daniel v. Boyd (In re Boyd), 347 B.R. 349, 356 (Bankr. W.D. Ark. 2006).  The burden of proof in an action to except a claim from discharge is on the objecting creditor who must prove the necessary elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654 (1991).

Vic argues in his brief that as to the JSR & Co. note and the Richmond & Co. note, he did not sign either note and that he is not liable to repay the debt.  The Court has already determined that Vic committed a fraud on the Bank and he is, therefore, liable on both notes. For the same reason the Court found Vic committed a fraud, Vic's debt to the Bank for the 2006 crop loan on behalf of Richmond & Co. and JSR & Co. is determined to be non-

dischargeable for violation of 11 U.S.C. § 523(a)(2)(A).[18]

The Debtors argue that Jill had nothing to do with the diversion of the 2006 loan proceeds to pay the 2005 crop loan and that everything was done by Vic and, therefore, her liability on the JSR & Co. loan to the Bank should not be determined to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). The record supports this argument. The Bank did not offer sufficient evidence to sustain its burden of proof. Therefore, as to Jill, judgment will be entered dismissing the allegations as to 11 U.S.C. § 523(a)(2)(A).[19]

## IV.

### 11 U.S.C. § 523(a)(6)
### WILLFUL AND MALICIOUS INJURY

The Bank claims that the Debtors are liable for willful and malicious injury to the Bank by selling the Bank's collateral, including crop proceeds, FSA payments, and custom harvesting and hauling proceeds, and converting the proceeds to their own use.

The Bankruptcy Code provides that certain debts are excepted from a Chapter 7 discharge including a debt "for willful and malicious injury by the debtor . . . to the property of another entity." 11 U.S.C. § 523(a)(6). In order to prevail, the plaintiff must prove by a preponderance of the evidence that the debt resulted from a willful and malicious injury to

---

[18]The Court notes that Vic's representation was not regarding his financial condition, rather the representation was regarding the condition Vic had to comply with in order to obtain the 2006 loan. Therefore, the representation falls within the ambit of 11 U.S.C. § 523(a)(2)(A).

[19] The Bank never pleaded or argued any agency relationship; therefore, the Court will not

analyze whether Vic's fraud could be imputed to Jill through an agency relationship.

the property of the debtor. Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 661 (1991); Fischer v. Scarborough (In re Scarborough), 171 F.3d 638, 641 (8th Cir. 1999).

The statute requires proof of two distinct elements, willfulness and maliciousness. In re Scarborough, 171 F.3d at 641; Barclays American/Business Credit, Inc. v. Long (In re Long), 774 F.2d 875, 880 (8th Cir. 1985). The word "willful" modifies the word "injury," indicating the statute requires "a deliberate or intentional injury." Kawaauhau v. Geiger (In re Gieger), 523 U.S. 57, 61, 118 S.Ct. 974, 977 (1998); In re Long, 774 F.2d at 881. The "willful" act is the same kind of intentional act that would give rise to liability for an intentional tort; therefore, a reckless or negligent action does not rise to the level of willful conduct. In re Geiger, 523 U.S. at 61, 118 S.Ct. 974; Siemer v. Nangle (In re Nangle), 257 B.R. 276, 282 (B.A.P. 8th Cir. 2001), *rev'd on other grounds*, 274 F.3d 481 (8th Cir. 2001). To prevail under this exception, the creditor must show that the debtor intended the injury or that the injury was relatively certain to result from the act. In re Geiger, 523 U.S. at 61-63, 118 S.Ct. 974; In re Long, 774 F.2d at 881; In re Nangle, 257 B.R. at 282.

The creditor must also show that the debtor's act was malicious, that is, it was targeted at the creditor with intent to harm or with substantial certainty that financial harm would occur. Hobson Mould Works, Inc. v. Madsen (In re Madsen), 195 F.3d 988, 989 (8th Cir. 1999); In re Scarborough, 171 F.3d at 641. To show malice, circumstantial evidence of the debtor's state of mind can be used. Johnson v. Miera (In re Miera), 926 F.2d 741, 744 (8th Cir. 1991)(citing In re Long, 774 F.2d at 880-81)).

Courts look at the surrounding facts when deciding whether the use of some

proceeds of another's collateral to directly benefit oneself while not also benefitting the

business as a whole renders the actions malicious. See Johnson v. Logue (In re Logue), 249

B.R. 59, 64 (B.A.P. 8th Cir. 2003)(finding no malice because the debtor accounted for most

of the use of the proceeds; his pattern of previous behavior established that he was merely

trying to maximize the proceeds and maintain his cattle herd); First National Bank of

Fayetteville v. Phillips (In re Phillips), 882 F.2d 302, 305 (8th Cir. 1989)(finding the debtors

had no intent or expectation to harm their creditor because evidence showed that the debtors

were only trying to keep their company going in order to repay the loan); Barclays

American/Business Credit, Inc. v. Long (In re Long), 774 F.2d 875, 882 (8th Cir.

1985)(finding no malice relying on undisputed testimony that the debtor's only intent was to

benefit his creditors, and

stating that even though he inadvertently diverted money needed to meet critical corporate

obligations, the expenditures were minor considering the magnitude of the claims).  But see

Monsanto Company and Monsanto Technology, LLC v. Roeder (In re Roeder), 2009 WL

4907014 (Bankr. N.D. Iowa 2009)(finding malice and distinguishing Long, stating, "[the

debtor's] misuse of saved seed was not a last desperate act to reduce expenses in order to

save his farm operation. He maintained the infringing conduct for three crop years, and

during this period he expanded his grain operation by 268 acres. There is no doubt [the

debtor] wanted to continue farming, but his plan was to do so at Monsanto's expense");

Weiberg v. Thompson (In re Thompson), 316 B.R. 326, 330-331 (Bankr. W.D. Mo.

2004)(ruling debtor was liable for willful and malicious conversion, distinguishing Long

33

because the <u>Long</u> debtor admitted to the conversion and offered a business justification that convinced the court the conversion was not malicious; whereas here, the debtor admitted the cattle were unaccounted for, but did not admit the conversion and offered no justification); <u>United States v. Recker (In re Recker)</u>, 180 B.R. 540, 544 (Bankr. E.D. Mo.1995)(recognizing that the debtor engaged in a lease-management scheme after the creditor turned him down for subordination; he knew of a lien on crops, arranged for a sale without creditor approval, and paid no management fees or proceeds to the creditor; such facts were enough to demonstrate the debtor acted with malice.)

Vic is liable for willful and malicious injury to the Bank's property.  Both JSR & Co. and Jill doing business as JSR Farms granted a security interest in all farm equipment. (Pl. Ex. 20, 23, & 28.)  Neither the Bank nor Vic offered any proof that the Bank's security interest was perfected in any of the vehicles that were sold.  At trial, Vic apparently saw nothing wrong in selling the Bank's collateral if it consisted of vehicles because he claimed the Bank had no lien if a lien was not shown on the face of the title.  This is not a correct statement of the law.

A security agreement means an agreement that creates or provides for a security interest.  Ark. Code Ann. § 4-9-102 (74) (Michie 2001).  A security interest attaches to the collateral when the debtor signs a security agreement that describes the collateral sufficiently, the creditor is given value for its security interest, and the debtor has acquired rights in the collateral.  Ark. Code Ann. § 4-9-203 (Michie 2001); <u>River Valley Bank of Russellville v. Ace Sports Mgt. (In re Ace Sports Mgt.)</u>, 271 B.R. 131, 145-146 (Bankr.

E.D. Ark. 2004).

In Arkansas, perfection of a lien in a motor vehicle requires that evidence of the lien is placed on the face of the certificate of title or by recording the lien on the manufacturer's statement of origin.[20]  See Ark. Code Ann. § 4-9-310(b) (Michie 2001); Ark. Code Ann. § 4-9-311(Michie 2001); Ark. Code Ann. § 27-14-801-806 (Michie 2008).  The filing of the financing statement does not perfect a security interest in vehicles.  Ark. Code Ann. § 27-14-807 (Michie 2008).  An unperfected security interest simply means that the creditor has the last priority against other lien creditors or a bona fide purchaser; the security interest is valid between the parties to the agreement.  See Ark. Code Ann. § 4-9-317(a)(2)(A) (Michie 2001); Ark. Code Ann. 4-9-322 (Michie 2001); In re Stevens, 307 B.R. 124, 133 (Bankr. E.D. Ark. 2004).

Therefore, being unperfected does not destroy the security interest in favor of the Bank.  The Debtors make no argument whatsoever in their brief on the issue of the validity of the Bank's security interest in the farm equipment sold.

The amount received for the sale of equipment and the whereabouts of the proceeds is unaccounted for and the tax return amounts do not agree with the bankruptcy petition. The Bank's security interest in the equipment that was sold was valid according to evidence in the record, and Vic is guilty of converting the proceeds from the sale of the Bank's collateral.

---

[20] There is an alternate way to perfect a lien in a motor vehicle by directly filing with the Revenue Division of the Department of Finance and Administration. Ark Code Ann. § 27-14-806(a)(1)(B)(Michie 2008).

The bankruptcy petition reflects Vic's deliberate sale of a large amount of farm equipment in Jill's name.[21] This equipment includes 41 pieces of farm equipment sold from April 2007 to August 2007, totaling $293,046.80. Furthermore, the list of the equipment sold in 2007 as reflected on the Debtors' 2007 tax return is significantly different from the list the Debtor scheduled on the bankruptcy petition; only four items match. (Pl. Ex. 146.) The bankruptcy petition reflects that on June 25, 2007, the Debtor sold ten pieces of equipment to Vic's brother's LLC for $150,000.00. However, the Debtor's tax return reflects that the Debtor disposed of fifteen items of farm equipment on June 15, 2007, for $126,500.00. (Pl. Ex. 146.) The bankruptcy petition also reflects the Debtor sold twenty items on September 4, 2007, for $47,450.00; fifteen of the items were vehicles. (Pl. Ex. 84.) The Debtors' tax return reflects twenty-nine items of farm equipment were disposed of on September 4, 2007 for $77,000. Only one item on this list is a vehicle. (Pl. Ex. 146.) The bankruptcy schedules represent that Vic, on April 6, 2007, disposed of five 2002 F250 Ford trucks for $54,000.00. (Pl. Ex. 84.) However, the tax return reflects not only did the Debtor not dispose of any equipment on April 6, 2007, there were no 2002 F250 Ford trucks disposed of during the 2007 year. (Pl. Ex. 146.) The bankruptcy petition lists equipment sold in 2007 totaling $293,046.80. The tax return reported only $234,150.00 as the amount received from the sale of equipment in 2007. (Pl. Ex. 84 & 146.)

The record reflects six different bank accounts held by the Debtors and their various

---

[21] The bankruptcy schedules were amended, but this was after the omissions were pointed out. Therefore, the Court will refer to the original bankruptcy petition. (Pl. Ex. 84.)

36

entities in 2007. Jill's personal account at First National Bank of Eastern Arkansas is the only account reflecting deposits as a result of equipment sold and these deposits totaled $234,000.00. Vic does not deny that most of the proceeds from the sale of the farm equipment was deposited into Jill's personal account and were immediately spent for both business and personal expenses in 2007, including attorney's fees.[22] (Pl. Ex. 145.)

Vic converted other items of the Bank's collateral. On September 21, 2006, JSR & Co. sold cotton to Jess Smith & Sons Cotton for $6,758.16 and spent the money on labor costs. (Def. Ex. 9.) On November 24, 2006, JSR & Co. sold cotton to Telmark and Fambro Warehouse Co. for $302,584.00, but only paid the Bank on the crop production loan the sum of $55,584.38. (Pl. Ex. 152; Def. Ex. 9.) The other $247,000.00 was spent by paying $103,194.13 to Richmond & Co. for "rent/lease/s-t loan payment," $24,761.80 to Naeda Financial, Ltd. for equipment lease, and $10,000.00 to Cunningham, Inc. for "gas and diesel." (Pl. Ex. 14; Def. Ex. 9.)

On December 13, 2006, JSR & Co. sold cotton to Frambo Warehouse Co. and received $253,250.19 in proceeds. However, only $90,493.19 was paid to the Bank. $100,000.00 was transferred to Richmond & Co. for "equipment lease" and the balance was spent on miscellaneous expenses. (Def. Ex. 9.) Richmond & Co.'s account at Helena National Bank characterized the $100,000.00 payment from JSR & Co. as "equipment

---

[22] Not a single piece of equipment listed on the bankruptcy petition as having been sold appears on the list of equipment Vic represented to the Bank as being owned by Jill and worth $866,750.00. (Pl. Ex. 17.) None of the equipment is listed as being owned by Robert. (Pl. Ex. 1.)

lease/s-t loan" and on December 12, 2006, Richmond & Co. paid H & H Farms, LLC, $48,966.00 for cotton harvest and on December 14, 2006, paid $50,000.00 on the American Express bill.  (Def. Ex. 14.)

Richmond & Co. received payments for cotton sales on November 3, 2006, of $1,367,618.48 and paid $404,425.00 on the Donley rent, $862,193.48 to the Bank on the 2006 crop loan, and converted the remaining $100,000.00.[23] (Pl. Ex. 152; Def. Ex. 12.)  The $100,000.00 was used to pay Producers Tractor $35,000.00 on November 7, 2006, JSR & Co. $5,201.03 for gas on November 9, 2006, $1,000.00 to PayPal to entertain a client, and the balance on miscellaneous expenses. (Def. Ex. 12.)

Vic, therefore, converted the proceeds from the sale of cotton from the 2006 crop sold by Richmond & Co. and JSR & Co. in at least the sum of $516,515.16.

Vic also converted some of the FSA payments in which the Bank held a perfected lien as follows:

1.      The Richmond & Co. account at Helena National Bank reflects a deposit of $50,197.00 from FSA on September 13, 2006.  This was used to pay part of an American Express bill of $113,309.03 on the same date; none of it went to the Bank. (Def. Ex. 14.)

2.      The JSR & Co. account at the Bank reflects a deposit of $40,790.00 from FSA on September 8, 2006, which was spent on a $16,407.54 overdraft and on miscellaneous expenses. None of the money was paid to the Bank. (Def. Ex. 9.)

---

[23] The Donley rent has priority over the Bank's security interest.  See Ark. Code Ann. § 18- 41-101(b)(Michie 2003).

3.       The JSR & Co. account at the Bank reflects a deposit of $47,739.00 from

FSA on September 13, 2006, which was spent on lease payments to Producer Tractor and on

miscellaneous expenses. None of this money was paid to the Bank. (Def. Ex. 9.)

The security agreement signed by Richmond & Co. granted a security interest in

proceeds of custom hauling and harvesting to the Bank.  (Pl. Ex. 1-7.)   Vic converted the

Bank's security interest in these custom harvesting proceeds in the amount of

$1,288,456.13. (Def. Ex. 12, 14, & 15.)  None of these proceeds were paid to the Bank.

The magnitude of the value of the Bank's collateral that Vic converted is ample

evidence of his malice towards the Bank.  The dischargeability of the debt owed by Vic is

denied for violation of 11 U.S.C. § 523(a)(6) for willful and malicious injury to the Bank's

security interest.

The Court's previous comments regarding Jill's participation in this activity apply to

this Count as well.  Judgment will be entered in favor of Jill dismissing this Count as to her

for the reasons previously stated.

### V.

### 11 U.S.C. § 727(a)(3)
### ADEQUATE RECORDS

The Bank alleges that both Debtors should be denied a discharge for violating 11

U.S.C. § 727(a)(3).  The Bankruptcy Code provides in relevant part that the Debtor is

entitled to a discharge unless "the debtor has . . . failed to keep or preserve any recorded

information . . . from which the financial condition . . . might be ascertained, unless such

failure to act was justified under the circumstances of the case."   11 U.S.C. §

727(a)(3)(2009).

Under this statute, debtors have an affirmative duty to create records accurately documenting their financial affairs.  Peterson v. Scott (In re Scott), 172 F.3d 959, 969 (7th Cir. 1999) (citing In re Juzwiak, 89 F.3d 424, 427-428 (7th Cir. 1996));  Meridian Bank v. Alten,  958 F.2d 1226, 1230-31 (3rd Cir. 1992); In re Connors, 273 B.R. 764, 769-70 (S.D. Ill. 2001).  The law recognizes that the trustee and creditors are entitled to accurate information showing what property has passed through the debtors' hands prior to bankruptcy.  The debtor's record-keeping must "enable the creditors to learn what he did with his estate." First State Bank of Newport v. Beshears (In re Beshears), 196 B.R. 468, 474 (Bankr. E.D.Ark. 1996) (quoting Koufman v. Sheinwald, 83 F.3d 977 (1st Cir. 1936)).

The Code requires written evidence from which the debtor's financial condition may be ascertained.  Christy v. Kowlaski (In re Kowalski), 316 B.R. 596, 601 (Bankr. E.D.N.Y. 2004) (citing McCord v. Sethi (In re Sethi), 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000) (citing Barristers Abstract Corp. v. Caulfield (In re Caulfield), 192 B.R. 808, 823 (Bankr. E.D.N.Y. 1996))).  Intent by a debtor to conceal his financial condition is not an element required for denial of discharge based on failure to keep adequate records. St. Francis County Farmers Ass'n. v. Wright (In re Wright),  353 B.R. 627, 649 (Bankr. E.D. Ark. 2006)(citing In re Pulos, 168 B.R. 682 (Bankr. D.Minn. 1994)); In re Kowalski, 316 B.R. at 602 (citing Thales v. Erdheim (In re Erdheim), 197 B.R. 23, 29 (Bankr. E.D.N.Y. 1996)).

The plaintiff has the burden of proving each element of an objection to discharge by a preponderance of the evidence.  Floret, LLC v. Sendecky (In re Sendecky), 283 B.R. 760,

763 (B.A.P. 8th Cir. 2002) (citing Korte v. United States  Internal Revenue Serv. (In re Korte), 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001)).  The plaintiff has the burden of proving that the debtor failed to maintain adequate records and that his failure makes it impossible to ascertain the debtor's financial condition or transactions. Cadle Co. v. Stewart (In re Stewart),  263 B.R. 608, 615 (B.A.P. 10th Cir. 2001) (citing Gullickson v. Brown (In re Brown), 108 F.3d 1290, 1295 (10th Cir. 1997)); Grisham Farm Products, Inc. v. Keller (In re Keller), 322 B.R. 127, 132 (Bankr. E.D. Ark. 2005)(citing Meridian Bank v. Alten, 958 F.2d 1226, 1233 (3rd Cir. 1992)).

　　　Once a creditor introduces proof that the debtor's records are inadequate, the burden shifts to the debtor to prove the inadequacy is justified under the circumstances of the case. St. Francis County Farmers Ass'n v. Wright (In re Wright), 353 B.R. 627, 649 (Bankr. E.D. Ark. 2006) (citing In re Womble, 108 Fed. Appx. 993, 2004 WL 2185744 (5th Cir. 2004)). Factors to be considered in determining whether the debtor's inadequate record-keeping are justified under the circumstances include the debtor's education, business experience, sophistication, and personal financial structure, volume, and complexity of the debtor's business.  In re Wright, 353 B.R. at  650 (citing First State Bank of Newport v. Beshears (In re Beshears), 196 B.R. 468, 474 (Bankr. E.D. Ark. 1996); Womble, 108 Fed. Appx. at 996)).

　　　The facts have been previously discussed in part as to the liability of Jill and the Court adheres to its previous finding that the Bank has produced insufficient evidence to prove that she had anything to do with the business of keeping adequate records of Vic's business activities.  Therefore, she is not liable to lose her discharge under this section.

41

As to Vic, however, his discharge for all the debts owed to all creditors will be denied for violation of 11 U.S.C. § 727(a)(3). The evidence is that proper records were not kept; many of the records that were kept were incorrect and some were obviously fraudulent rendering all of the records unreliable.

There were four major players involved in the 2006 farming operation: JSR & Co., Richmond & Co., Richmond Gin, and JSR Farms. Later in 2007, new entities appeared: R.D. Farm Group, D.V. Farm Group, and FARMMGR. At least fifteen different bank accounts were involved and they have previously been identified. Vic caused vast sums of money to move between these accounts and the only record of the purpose of the transfers are either notations on the check or the bookkeeper Knight's description of the transaction on the check register. Many of Knight's descriptions on the check register are so obviously wrong they are per se fraudulent. Some transfers are described as loans, but no notes were ever executed between the entities and no other loan documents were prepared. Some transfers were for lease payments, but no lease documents exist to chronicle what was being leased or what the terms of the lease were. Some transfers were for custom work or cotton hauling but then there is no description of the work done or by whom. No records were kept regarding these. The partnerships, JSR & Co. and Richmond & Co., were partnerships with named managing partners. The partners were corporations whose presidents were family members or employees. The evidence is undisputed that the managing partners did not manage; Vic did. The corporations seldom met, kept no records, had no assets, kept no minutes, and were complete shams as were the partnerships JSR & Co. and Richmond &

Co.   JSR Farms was a name for Jill, individually who, according to Vic, was not involved in any of the business activities except to sign some checks or documents when he asked to her to do so.  He testified she only wanted to raise their children.  (Tr. 7/28/09 at 347.)

The partnerships only served to provide names for the bank accounts that Vic used to circulate his money.  Vic seldom signed his own name to checks and he never signed his name to important documents.  Vic engaged in check kiting as has been previously discussed and has paid his and Jill's personal expenses out of the business bank accounts while making fictitious descriptions of the real purpose of many of the checks.[24]  A few examples of the misidentification of checks will illustrate the point: Richmond & Co. made a payment of $930.00 to Brush County Taxidermy described as "Supplies and Sm Tools" (Def. Ex. 15); a payment of $500.00 to Vic's daughter described as "Machinery Repair" (Def. Ex. 15); another check to Vic's daughter in the amount of $728.75 described as "Office Supplies" (Def. Ex. 12); a check for $2,437.00 made to a hunting lodge, Bent Creek Lodge, was described as a "Building Expense" (Def. Ex. 14); and another check to a hunting lodge, Big Creek Lodge, in the amount of $1,956.00 described as a "Travel Expense" (Def. Ex. 12.).  A few examples of misidentified checks of JSR Farms or Jill, individually, are the following: a check for $1,000.00 and a check for $300.00, both to Vic's daughter described as "Office Supplies" (Def. Ex. 8); a check for $15,00.00 to Sky Quest for traveling expenses on a private airplane described as "Dues and Publication" (Def. Ex. 8); a check to Amalfi

---

[24]It does not appear that Vic maintains a personal business account because none was produced at trial.

Coast Resort Association for $1,326.57 for property association dues on their Florida

condominium described as "Cash Rent" (Def. Ex. 8); and three checks to Jill from Jill, one

in the amount of $4,000.00 described as "Equipment Lease," and the other two checks for

$2,000.00 and $600.00 both described as "Misc Expense." (Def. Ex. 8).

Richmond & Co. had an account with American Express that was in the name of Jill

and Robert, although Vic used the card most of the time, according to his testimony.  (Pl.

Ex. 132 & Tr. 589-590, 596.)  The account in 2006 was paid out of the Richmond & Co.

account at Helena National Bank.  (Def. Ex. 14.)  Payments from January 2006 to December

2006  were made on the account totaling $972,797.71 and described in Richmond & Co.'s

check register as payments for equipment leases, machinery repair, or gas and oil.  However,

the charges on the account were for a vast array of combined personal and business

expenses, most of which are unrelated to equipment leases, fuel, or machinery repair.  These

charges were made at a variety of businesses including American Eagle clothing, satellite

radio, Texaco gas, Petco, Wal-Mart, Dillards, Target, Home Depot, Steinmart, Gallery

Furniture in Houston,  the Knight Law Firm,[25]  Lacey's Marina in Higden Arkansas, Linens

---

[25]Payments to Knight Law Firm totaled $84,882.80, between January 2006 and
December 2006.

N Things,  White House Black Market, a casino charge, drug stores, numerous restaurants,[26] car rental agencies, numerous hotels,[27] airline tickets (including tickets to Atlanta for Vic's daughter),  JC Penny, and grocery stores. Also, the account reflect charges for psychiatric

---

[26]Some of the restaurant charges include: Italian Ristorant in San Antonio, $192.52; Houston's in Memphis, $87.11; Red Lobster $49.75; Chilli's, $70.87; Bordino's in Fayetteville, $ 184.25, Doe's in Fayetteville, $ 193.82; A Taste of Thai in Fayetteville, $71.41; Power House Seafood $94.37; U.S. Pizza, $43.11; Flemings in Memphis, $474.34; Outback Steakhouse, $74.65; Flying Saucer, $21.88; PF Changs, $63.43; Kobe's Japanese Steakhouse, $147.03; On the Border, $32.56; Theo's in Fayetteville, $226.07; U.S. Pizza, $36.46; Outback in South Haven, $136.85; Red Lobster in South Haven, $60.39; Sakura Japanese Steak House in Corpus Christi, $150.93; Chilli's in Madison, $53.87; Old Bay Steamer in Fort Walton, $120.88; Rick's Crab Trap in Fort Walton, $96.75; Acme Oyster Bar in Sandestin, $127.65; Destin Chops, $302.07; Pompano Joe's in Destin, $71.41; Houston's in Memphis, $95.75; Benihana in Memphis, $145.37; Nola Restaurant in New Orleans, $207.31; Bourbon House in New Orleans, $132.56; Red Lobster in Southaven, $116.97; Morton's of Atlanta, $282.69; and Bonefish Grill at Rogers, Arkansas, $334.42.

[27] The following are the hotel charges:  Embassy Suites, Dallas, TX, 12/12/05; Comfort Inn, Little Rock, 12/14/05; Marriot Hotel, San Antonio, Texas, 1/07/06; Hampton Inn, Memphis, Tennessee, 1/09/06; Comfort Inn, Little Rock, 1/17/06; Dakota Magic Casino, Hankinson, North Dakota, 1/20/06 (three nights); Country Inn, Fargo, North Dakota, 1/20/06 (two nights); Drurry Inn, Sikeston, Missouri, 2/09/06; Comfort Inn, Corpus Christi, Texas, 3/10/06; Embassy Suites, Little Rock, Arkansas 4/13/06 (three nights); Embassy Suites, Rogers, Arkansas, 4/21/06 (two nights); Embassy Suites, Little Rock, Arkansas, 4/22/06; Hotel.com, Texas, 5/10/06; Comfort Inn, Kingsville, Texas, 5/24/06 (two nights);Comfort Suites, Hattiesburg , Mississippi, 5/26/06; Hampton Inn, Memphis, Tennessee, 6/17/06; DoubleTree, Memphis, Tennessee, 6/17/06; Embassy Suites, Memphis, Tennessee, 6/21/06; Quality Inn, Kingsville, Texas 6/24/06; Hilton Hotel, Memphis, Tennessee, 6/26/06; Embassy Suites, Memphis, Tennessee, 6/26/06, Comfort Inn, Kingsville, Texas, 7/08/06; Marriot, New Orleans, Louisiana, 7/24/06 (two nights); Super 8 Motel, Kingsville, Texas, 08/05/06; Comfort Inn, Kingsville, Texas, 08/04/06 (seven nights); Comfort Inn, Kingsville, Texas, 08/16/06; Super 8 Motel, Kingsville, Texas, 08/22/06; Comfort Inn, Kingsville, Texas, 08/22/06; Marriot, Atlanta, Georgia, 8/28/06; Quality Inn, Kingsville, Texas, 08/28/08; Motel 6, Helena, Arkansas, 09/01/06; Holiday Inn, Springdale, Arkansas, 9/04/06; Hampton Inn, Fayetteville, Arkansas, 9/04/06; The Ritz-Carlton, Atlanta, Georgia, 09/17/06.

services, dental services, and trips to Florida.  (Pl. Ex. 132.)

Often, shortly before the American Express bill was to be paid from the Richmond & Co. account at Helena National Bank, Vic would transfer money from some other account to help cover the payment.

The evidence establishes by an overwhelming preponderance of the evidence that Vic did not keep adequate or honest records, either individually or on behalf of JSR & Co. and Richmond & Co., from which his financial affairs might be ascertained.  Vic's failure to keep adequate records is not justified just because he is a farmer.  See Grisham Farm Products, Inc. v. Keller (In re Keller), 322 B.R. 127 (Bankr. E.D. Ark. 2005).   His business involved millions of dollars, and he could have hired an honest accountant to keep accurate records, but he did not.  Therefore, Vic's discharge is denied for violation of 11 U.S.C. § 727(a)(3).

## VI.

## 11 U.S.C. § 727(a)(4)(A)
## FALSE OATH

The Bank alleges that both Debtors should be denied a discharge for violating 11 U.S.C. § 727(a)(4)(A).  11 U.S.C. § 727(a)(4)(A) provides that "the court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case made a false oath."  To prevail on a complaint brought pursuant to 11 U.S.C. § 727(a)(4)(A), the plaintiff must establish that the debtors (1) made the statement under oath; (2) the statement was false; (3) the statement was made with fraudulent intent; (4) the debtor knew the statement was false; and (4) the statement related materially to the debtor's

bankruptcy.  Hamilton v. Hamilton (In re Hamilton), 390 B.R. 618, 624 (Bankr. E.D. Ark. 2008)(citing Jacoway v. Mathis (In re Mathis), 258 B.R. 726, 735 (Bankr. W.D. Ark. 2000)).

The plaintiff has the burden of proving facts essential to an objection to discharge. Fed. R. Bankr. P. 4005.  The relevant standard for proof in a § 727 case is by a preponderance of the evidence.  In re Mathis, 258 B.R. at 733 (citing Barclays/American Bus. Credit, Inc. v. Adams ( In re Adams), 31 F.3d 389, 393-94 (6th Cir. 1994). See also Farouki v. Emirates Bank Int'l, 14 F.3d 244, 250 n. 17 (4th Cir. 1994); In re Beaubouef, 966 F.2d 174, 178 (5th Cir.1992); In re Serafini, 938 F.2d 1156, 1157 (10th Cir. 1991).  Once a creditor has introduced evidence that the debtor committed any of the prohibited acts, the debtor then has the burden of coming forward with the evidence to explain his conduct. Ramsay v. Jones (In re Jones), 175 B.R. 994, 997 (Bankr. E.D. Ark. 1994)(citing Jolles v. Freedman (In re Freedman), 693 F.2d 50, 51 (8th Cir. 1982)).

The Bankruptcy Code requires debtors to fully complete the schedules and statement of affairs under oath.  Korte v. Internal Revenue Service (In re Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001); Cepelak v. Sears (In re Sears), 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000)(citing 28 U.S.C. § 1746).  Statements made with reckless regard for the truth are regarded as intentionally false.  In re Korte, 262 B.R. at 474 (citations omitted); Bold City VII, Ltd. v. Radcliffe (In re Radcliffe), 141 B.R. 1015, 1021 (Bankr. E.D. Ark. 1992).

Omissions from the schedules qualify as false oaths if they are made knowingly and with fraudulent intent.  In re Sears, 246 B.R. at 347(citing Mertz v. Rott, 955 F.2d 596, 598

(8th Cir.1992)); <u>Johnson v. Baldridge (In re Baldridge)</u>, 256 B.R. 284, 289 (Bankr. E.D. Ark

2002).  A debtor rarely admits fraudulent intent; therefore, the objecting party may rely on

circumstantial evidence that suggests the necessary intent.  <u>In re Korte</u>, 262 B.R. at 474;  <u>In</u>

<u>re Jones</u>, 175 B.R. at 1002 (citing <u>McCormick v. Security State Bank</u>, 822 F.2d 806, 808

(8th Cir. 1987)).

 The statement or omission is material if it bears a relationship to the debtor's

business transactions or estate, or concerns the discovery of assets, business dealings, or the

existence and disposition of the debtor's property.  <u>Mertz v. Rott</u>, 955 F.2d at 598; <u>In re</u>

<u>Sears</u>, 246 B.R. at 347.

 Question 2 of Schedule B asks for a description and location of checking, savings or

other financial accounts on the date the petition was filed, and the answer to this question

was marked none.  (Pl. Ex. 84.)  Jill maintained an account at First National Bank of Eastern

Arkansas.  (Pl. Ex. 145.)  Vic controlled an account in the name of  FARMMGR at First

National Bank of Eastern Arkansas and Bank of America, an account in the name of R.D.

Farm Group at Citizens Deposit Bank and First National Bank of Eastern Arkansas, and an

account in the name of D.V. Farm Group at Bank of America and First National Bank of

Eastern Arkansas.  (Pl. Ex. 148-150, 86, 88, 89, & 92.)  Therefore, the answer to this

question is false and both Jill and Vic knew the answer was false because they were actively

using the accounts on the day the petition was filed.

 Question 9 of Schedule B asks what interest the debtors have in insurance policies,

the name of each policy, and the cash surrender or refund value.  Debtors answered none.

(Pl. Ex. 84.)  On June 8, 2007, a check was written to Lincoln Benefit Life Company on

FARMMGR's account at First National Bank of Eastern Arkansas for $1,760.00.  (Pl. Ex.

149.)  The answer to this question is false.

Question 13 of Schedule B asks the Debtors to state all interest in incorporated or

unincorporated businesses.  The Debtors failed to include JSR Farms, Vic Richmond

Farming, and Vic Richmond Farms.  (Pl. Ex. 84.)

Schedule I ask the Debtors to list current income on the date the petition is filed.  Jill

reports that she made a gross salary of $1,823.47 per month and $2,733.73 monthly income

from real property in 2007.[28]  (Pl. Ex. 84.)  Vic reports that he has no income, that he is

unemployed, and even added a note to his creditors that "[i]t is hoped that Vic Richmond

will be able to find gainful employment within the next year."  (Pl. Ex. 84.)  The response to

this question about current income is false and Vic and Jill knew that it was false.  In 2007,

Vic created and controlled FARMMGR.  FARMMGR manages, through Vic, the same farm

land that JSR & Co. and Richmond & Co. farmed in 2006.  D.V. Farm Group farmed the

land in Jefferson County and R. D. Farm Group farmed the land in Phillips County. (Tr.

7/28/09 at 413.)  R. D. Farm Group and D. V. Farm Group paid FARMMGR beginning in

April 2007 approximately $10,000.00 a month for the management services.  FARMMGR

---

[28]This entry appears to be an error. $2,733.73 x 12 months = $32,804.76.  Nowhere in
the other records does this appear.  Vic testified that the rent income for the farm land
jointly owned was $14,000.00 a year.  (Tr. 7/28/09 at 439).

received total income in 2007 in the sum of $150,321.28.[29]  (Pl. Ex.149.)

From April 3, 2007 to December 31, 2007, a monthly average of $16,702.36 was paid to FARMMGR for mostly management services and auto leases. (Pl. Ex. 149.)  Vic testified that Jill was furnished a Tahoe vehicle in 2007 by FARMMGR.  (Tr. 7/29/09 at 464.)  Vic was also furnished a Ford F-150 truck and Case was furnished a Chevrolet pick-up from FARMMGR.  (Tr. 7/29/09 at 464.)  Fuel for all of the vehicles was furnished by FARMMGR.  (Tr. 7/29/09 at 465.)  In addition, the Debtors' 2007 tax return show the Debtors received $140,292.00 in capital gain income in 2007; rent income from the condominium in Florida of $12,431.00; gross income from farming in 2007 of $42,749.00; and dividends paid by Richmond Gin in the amount of $5,007.00.  R.D. Farm Group also paid Vic $14,000.00 on April 3, 2007, as rent income on land they own jointly.  (Pl. Ex. 86; Tr. 7/28/09 at 438.)  On August 31, 2007, an additional payment for farm rent from R.D. Farm Group in the sum of $7,140.00 was paid to Vic, and this income was not included on the 2007 tax return.  (Pl. Ex. 86.)

Plaintiff's Exhibit 148 shows numerous personal expenses paid by FARMMGR in 2007, many of which were incurred by the Debtors' children Case and Laura Jill.  These constitute income, even though all are classified as general farm expenses on the check register including the following:

| **DATE** | **PAYEE** | **AMOUNT** | **PURPOSE** |
|---|---|---|---|

---

[29]A receipt from June 25, 2007, in the amount of $3,680.00 was recorded as being from Jill for "custom work."  Jill's bank statement records the transfer to be for "contract labor" and "insurance."  (Pl. Ex. 145 & 149.)

| | | | | |
|---|---|---|---|---|
| 6/04/07 | Crown at Razorback | $ | 940.00 | Laura Jill's Rent (Tr. 9/29/09 at 53) |
| 6/08/07 | Lincoln Benefit Life Co. | $ | 1,760.00 | Life Insurance |
| 7/30/07 | FBC | $ | 200.00 | Church Donation |
| 8/02/07 | Crown at Razorback | $ | 940.00 | Laura's Rent |
| 8/06/07 | Case Richmond | $ | 100.00 | Personal Exp. |
| 8/09/07 | Case Richmond | $ | 196.00 | Personal Exp. |
| 9/10/07 | Sherwood Urgent Care | $ | 72.62 | Case |
| 9/10/07 | Century Tel | $ | 90.70 | Home Phone (Petition) |
| 9/10/07 | Dillard's | $ | 404.33 | Personal Clothes |
| 9/10/07 | Gulf Power | $ | 223.00 | Condo Exp. |
| 9/27/07 | Swepco | $ | 104.43 | Laura Jill's Utilities |
| 09/28/07 | Crown at Razorback | $ | 441.78 | Laura Jill's Rent |
| 10/02/07 | Hickory Hill Pharmacy | $ | 50.00 | Case |
| 10/02/07 | PGM Pathology | $ | 21.25 | Jill |
| 10/02/07 | Helena Radiology, Inc. | $ | 32.10 | Jill |
| 10/02/07 | Century Tel | $ | 91.05 | Home Phone (Petition) |
| 10/02/07 | Marvel Clinic Pharmacy | $ | 45.00 | Drugs |
| 10/02/07 | PGM Pathology | $ | 274.00 | Laura Jill |
| 10/02/07 | GAP | $ | 142.44 | Clothes |
| 10/14/07 | Swepco | $ | 66.04 | Fayetteville Utilities |
| 10/14/07 | Ruch Clinic | $ | 147.09 | Laura Jill |
| 10/14/07 | Crye-Leike Coast Realty | $ | 70.00 | Condo Exp. |
| 10/14/07 | Gulf Power | $ | 138.61 | Condo Exp. |
| 10/16/07 | Case Richmond | $ | 420.00 | Personal Exp. |
| 11/01/07 | Century Tel | $ | 90.72 | Home Phone |
| 11/01/07 | Marvel Clinic | $ | 35.00 | Jill |
| 11/01/07 | American Eagle Outfitters | $ | 130.39 | Personal Clothes |
| 11/02/07 | Crown at Razorback | $ | 940.00 | Laura Jill's Rent |
| 11/02/07 | Crown at Razorback | $ | 441.78 | Laura Jill's Rent |
| 11/06/07 | Scott Hall, M.D. | $ | 36.45 | Case |
| 11/06/07 | Gulf Power | $ | 85.56 | Condo Exp. |
| 11/06/07 | Dr. Campbell | $ | 69.20 | Case |
| 11/08/07 | DeSoto School | $ | 2,442.16 | Private School - Case |
| 11/09/07 | Lewis Etoch | $ | 2,500.00 | Personal Legal Fees |
| 11/11/07 | FBC | $ | 600.00 | Jill - Church |
| 11/19/07 | Crye-Leike Coastal Realty | $ | 35.00 | Condo Exp. |
| 11/19/07 | Swepco | $ | 51.91 | Laura Jill's Utilities |
| 11/21/07 | Jill | $ | 4,894.47 | Transfer |
| 11/30/07 | Hickory Hill Pharmacy | $ | 18.79 | Case |
| 11/30/07 | Marvell Clinic Pharmacy | $ | 204.80 | Jill |
| 12/03/07 | FBC | $ | 800.00 | Church Donation |

| | | | |
|---|---|---|---|
| 12/03/07 | Century Tel | $ 91.89 | Home Phone |
| 12/05/07 | Gulf Power | $ 77.87 | Condo Exp. |
| 12/16/07 | FBC | $ 1,200.00 | Church Donation |
| 12/16/07 | FBC | $ 200.00 | Church Donation |
| 12/17/07 | Swepco | $ 66.42 | Laura Jill's Utilities |
| 12/31/07 | Crown at Razorback | $ 940.00 | Laura Jill's Rent |

TOTAL:                          $22,922.85

The Debtors' use of business income to pay personal expenses is also disclosed on the check register of FARMMGR, continuing in 2008 at two different banks. (Pl. Ex. 148 & 150.) The check registers were introduced without any other records. The 2008 expenses that appear to be personal add up to well over $30,000.00; the personal expenses include, to name a few, more rent and utility payments for their children, Florida condominium expenses, medical expenses, church donations, numerous lunch expenses, sorority dues, liquor store charges, charges to Victoria's Secret and other clothing stores, and many more miscellaneous expenses. The register often reflected two or three charges for "lunches" in the same day.

On Schedule J, the Debtors list current expenditures of $5,455.24 a month, which computes to $65,462.88 a year. This is more evidence that Vic was employed in 2007.

The next form, which is part of Schedule J, asks for income and expenses of any business the Debtors operate. The question that asked about gross income for the past twelve months was simply not answered. The questions regarding future monthly expenses were all filled in as "$0.00." Not only did Vic manage two 5,000 acre farms in 2007, he grossed approximately $20,000.00 a month beginning in April 2007 for management services in the name of FARMMGR. He also controlled Richmond Gin, which grossed

more than $2 million in 2007.

Although the evidence in the case does not establish that Jill participated in Vic's farming activities, she had to know the petition she signed under oath was false when it represented that Vic was unemployed, did not operate any business, and had no income in 2007. She was a part-owner of Richmond Gin, she signed checks on her personal bank account in 2007, she drove vehicles furnished by FARMMGR, and spent money for living expenses. She knew the money she was spending had to come from somewhere. Under these facts it would not be possible for her to reasonably believe her husband was unemployed. Obviously, Vic knew; he was writing himself checks, managing the farms, running the gin operation, and selling the Bank's collateral.

The statement of Financial Affairs was not introduced into evidence by the Bank and will not be considered as a basis to deny the Debtor's discharge. However, for purposes of a possible criminal investigation of the matter, additional false statements are listed as follows:

> Question 1 of the Statement of Financial Affairs asks the Debtors to state income from their employment or operation of business for the calendar year and the two years preceding the calendar year in which the case is filed. The Debtors simply declined to answer this question.
> Question 4(b) asks the Debtors to describe any property that has been attached, garnished, or seized under legal or equitable process within one year of the filing of the case. The Debtors checked none, which is false. Thousands of dollars worth of equipment was seized from the Debtors by the Bank and sold at an auction. (Pl. Ex. 143.)
> Question 10 asks the Debtors to "[l]ist all other property . . . transferred either absolutely or as security within two years immediately preceding the commencement of the case." The Debtors transferred 55% of Jill's interest in Richmond Gin to Case and Laura Jill within a year of the date the petition was filed and did not disclose that transfer. (Tr. 7/28/09 at

297; 2007 tax return.)

Question 11 asks the Debtors to "[l]ist all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold or otherwise transferred within one year immediately preceding the commencement of this case." The Debtors checked none and this is false. Two accounts in the name of Richmond & Co. and two accounts for JSR & Co. were all closed in April of 2007. (Pl. Ex. 152.) Both Debtors had to know the answer to this question was false.

Question 18 asks the nature, location and name of all businesses, etc. and the Debtors failed to answer the question except to state "will supplement." As stated previously, Vic, was farm manager of two 5,000 acre farms under the name of FARMMGR and also operated and controlled Richmond Gin on the date the petition was filed. This is a false answer by failure to disclose.

Question19 asks the Debtors to list all bookkeepers who, within two years immediately preceding the filing of the bankruptcy case, supervised or kept books, accounts and records of the Debtors. The Debtors checked none when they both knew Knight kept the books and records of all of the various accounts maintained by the Debtor and the entities they controlled, including Jill's personal account. The answer to this question is false.

Question 19(d) asks the Debtors to list all financial institutions or other parties to whom a financial statement was issued within the previous two years. The Debtors checked none which was untrue. A personal financial statement prepared by Vic was issued to the Bank in March 2006 in Jill's name. (Pl. Ex. 17.)

At trial, Vic falsely testified under oath that all of the money from cotton produced in 2006 went to the Bank. (Tr. 9/29/09 at 84.) Vic converted more than $400,000.00 from proceeds of cotton produced in 2006 by JSR & Co. and Richmond & Co. Vic also gave perjured testimony about unsold cotton from the 2005 crop produced by Richmond & Co. Vic agreed that the financial statement, prepared by him, stated that there was $736,300.00 worth of unsold crops from 2005. He then stated this was merely a projection and whatever proceeds he actually received from the 2005 crop went to the Bank. (Tr. 7/28/09 at 345.)

However, Richmond & Co. bank records reflect the following:

1.      On March 31, 2006, there was a $3,889.28 deposit from FRAMBRO, a cotton buyer, deposited to Richmond & Co.'s bank account. (Def. Ex. 12.)

2.      On June 7, 2006, there was a deposit from Jess Smith & Sons Cotton, LLC, a cotton buyer, in the amount of $14,089.26 from the sale of cotton.  The money was spent on miscellaneous expenses and none was paid to the Bank on the loan.  (Def. Ex. 12.)

3.      On March 27, 2006, a deposit from Jess Smith & Co. for $71,519.04 from cotton sales to Richmond & Co. was made to its account at Helena National Bank.  The money was spent mostly on a payment on the American Express bill.  (Def. Ex. 14.)

The total received from the sale of 2005 cotton was $89,497.58; none of the proceeds were paid to the Bank on the 2005 crop loan of Richmond & Co., except perhaps the $3,889.28 deposit from FRAMBRO.

 Jill made no effort at all to explain the misstatements.  She did not testify.  Vic made no effort to explain the misstatements on the petition except that he thought he was unemployed because he did not receive "W-2" kind of income.  This, of course, makes no sense since he controlled the entity FARMMGR for whom he was working and he had the authority and the responsibility to issue W-2 forms or K-1 forms for the income Vic received for the work he performed.  Instead, he maintained that, even though he managed two 5,000 acre farms and Richmond Gin, he did all of this work for free and was, therefore, unemployed.  (Tr. 9/29/09 at 73, 87-88, 93, & 94.)

He put it this way:

COURT:      And then Farm Manager LLC is the company that you worked for - -

WITNESS:    I'm - -

COURT:    - - for free?

WITNESS:    I'm the named manager and I act on behalf of it, yes, sir.

COURT:    And you actually do work regularly for the company?

WITNESS:    Management, yes.

COURT:    And you don't get paid?

WITNESS:    No, sir.

COURT:    You don't consider the fact that it pays your personal expenses, that's a form of getting paid?

WITNESS:    Well, it actually does reflect a few of those that get through, but when - - Farm Manager, LLC is owned by Jill and myself and my two children, and any - - as this Farm Manager tax returns, I guess, will be reflected, it flows directly through to the individual.  So whether directly or indirectly, the income does make it through our personal accounting.  It's not on a W-2; it would be more considered on a 1099.  You know, it doesn't go away and it's not hidden, but it - - but the Farm Manager LLC, everything flows through directly to the individuals that own it . . . .

(Tr. 9/29/09 at 73.)

The evidence is, therefore, overwhelming that both Debtors made numerous false oaths and, therefore, their discharge is denied for violation of 11 U.S.C. § 727(a)(1)(A).

**VII.**

**11 U.S.C. § 727(a)(5)**
**FAILURE TO EXPLAIN LACK OF ASSETS TO MEET LIABILITIES**

11 U.S.C. § 727(a)(5) provides in relevant part that "[t]he court shall grant the debtor a discharge, unless  . . . the debtor has failed to explain satisfactorily, before determination

of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtors liabilities." As explained by one court, "once a creditor has established that the debtor owned substantial and identifiable assets, debtor must satisfactorily explain loss of such assets. The explanation should be sufficient that the Court does not have to speculate as to what happened to the assets or speculate as to the veracity of the explanation." First State Bank of Newport v. Beshears (In re Beshears), 196 B.R. 468, 472-73  (Bankr. E.D. Ark. 1996) (citing Bay State Milling Co. v. Martin (In re Martin), 145 B.R. 933 (Bankr. N.D. Ill. 1992)).  "If a party demonstrates a deficiency of assets, the burden shifts to the debtor to explain the loss. 'If the explanation is too vague, indefinite, or unsatisfactory then the debtor is not entitled to a discharge.' The explanation given by the debtor must be definite enough to convince the trial judge that assets are not missing." Floret, L.L.C. v. Sendecky (In re Sendecky) 283 B.R. 760, 766 (B.A.P. 8th Cir. 2002)(quoting Diamond Bank v.Carter (In re Carter), 203 B.R. 697, 707 (Bankr. W.D. Mo. 1996)); Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 619 (11th Cir. 1984).  See also Colonial Bank v. Wynn (In re Wynn), 261 B.R. 286, 304 (Bankr. M.D. Ala. 2001) (vague and indefinite answers such as "money were spent" are not sufficient); Huntington Center Partners v. Dupree (In re Dupree), 197 B.R. 928, 938 (Bankr. N.D. Ala. 1996)(debtor provided a list but no documents to account for the $19,000.00 in proceeds that was spent and failed to account for the dissipation of $11,000.00); Lacy Wholesale and Main Factors v. Bell (In re Bell), 156 B.R. 604, 606 (Bankr. E.D. Ark. 1993) (debtor's explanation of loss of assets was "unsubstantiated, uncorroborated and undocumented").

57

In this case, both Debtors have violated this provision.  Jill made no effort to explain her loss of assets to meet her liabilities.  She did not testify although present in Court each day of the trial.  Even though Vic testified that he conducted all of the business activities and that Jill was not involved except to run errands, no one ever testified that Jill was not the owner of the substantial assets attributable to her by the financial statement in her name.  According to JSR & Co. and Jill's April 2006 loan proposal, JSR & Co. had assets in the amount of $1,746,650.00 and Jill had assets in the amount of $2,762,900.00. (Pl. Ex. 17.)  Jill did not deny that she owned these assets.  Without some explanation or denial, this Court cannot find that she has satisfactorily explained her loss of assets to meet liabilities.

Vic also violated this section.  He reported to the Bank on behalf of these entities the existence of vast numbers of assets and amounts of equity.  According to Richmond & Co.'s March 2006 loan proposal, Richmond & Co. had assets in the amount of $1,618,000.00.  (Pl. Ex. 1.)  The bankruptcy petition reflects the total assets owned by both Debtors as of September 6, 2007, is in the amount of  $1,194,795.27.  Total liabilities listed on the petition are $11,256,611.91.

The Debtors' brief barely discusses the issue of where the assets went or why the liabilities were so high. The brief states that the value of cotton fell dramatically in 2006 and that the demand for machinery in the cotton business fell in 2007 as the explanation for the Debtors' lack of assets.  However, this argument is not supported by any evidence in the record.  Vic explained part of the problem was caused by boll lock on his 2006 crop caused by an untimely rain at harvest time. (Tr. 9/29/09 at 80-81.)  He said rainfall data would

58

corroborate his testimony, but no data was offered into evidence.  According to records offered by the Bank and testimony, the 2006 cotton crop in Phillips and Jefferson County was described as good, exceeding the 800 pounds per acre estimate by Vic. (Pl. Ex.141; Tr. 7/27/09 at 88 & 103.)  Other than his testimony regarding boll lock, Vic makes little effort to explain his lack of assets.  His records offer some explanation because they indicate that Vic sold a substantial portion of the Bank's collateral and spent the proceeds for personal and business obligations in 2007.  The record does not explain why the Debtors own so few assets to cover more than $10 million in debt.

The evidence establishes, therefore, by a clear preponderance of the evidence, that both Debtors, Vic and Jill, violated the provisions of 11 U.S.C. § 727(a)(5) by failing to explain satisfactorily the deficiency of assets to meet liabilities and, therefore, the discharge as to both Vic and Jill is denied.

## VIII.

## CONCLUSION

Vic is liable for the debts of Richmond & Co. and JSR & Co. for fraud.  Jill is liable to the Bank for the debt to the Bank owed by JSR & Co. because she signed the notes. Both Debtors are liable for miscellaneous debts for which they are personally liable.

The Bank makes additional allegations that the Debtors are liable for submitting a false financial statement in violation of 11 U.S.C. § 523(a)(2)(B), for embezzlement in violation of 11 U.S.C. § 523(a)(4), and for transferring and concealing property in violation of 11 U.S.C. § 727(a)(2).  It would unnecessarily lengthen this opinion to discuss the other

Counts in detail.

For the reasons stated previously, the debts owed to the Bank are as follows:

1.     3/31/06 Note; Richmond & Co.; Balance Due: $71,459.10 (Pl. Ex. 3 & 60.)

2.     3/31/06 Note; Richmond & Co.; Balance Due: $849,469.64.  (Pl. Ex. 6 & 60.)

3.     5/1/06 Note; JSR & Co.; Balance Due: $859,275.22.  (Pl. Ex. 19 & 60.)

4.     5/1/06 Note; JSR & Co.; Balance Due: $978,548.31 (Pl. Ex. 21 & 60.)

5.     7/19/06 Note; JSR & Co.; Balance Due: $318,647.50 (Pl. Ex. 22 & 60.)

6.     5/30/02 Note; Vic and Jill; Balance Due: $184,838.89 (Pl. Ex. 42 & 60.)

7.     5/30/02 Note; Vic; Balance Due: $110,230.59.  (Pl. Ex. 60.)

8.     7/1/04 Note; JSR, LLC and Jill; Balance Due: $170,935.55. (Pl. Ex. 60).

Therefore, judgment in favor of the Bank against Vic is granted as follows:

Note dated 3/31/06, Richmond & Co., $71,459.10; Note dated 3/31/06, Richmond & Co., $849,469.64; Note dated 5/30/02, Vic; $110,230.59; which totals $1,031,159.33 as of July 27, 2009.

Judgment in favor of the Bank against Vic and Jill, jointly and severally is granted as follows:

Note dated 5/1/06, JSR & Co., $859,275.22; Note dated 5/1/06, JSR & Co., $978,548.31; Note dated 7/19/06, JSR & Co., $318,647.50; Note dated 5/30/02, Vic & Jill, $184,838.89; which totals $2,341,309.92 as of July 27, 2009.

Judgment in favor of the Bank against Jill is as follows:

Note dated 7/1/04, $170,935.55 as of July 27, 2009.

The discharge of Vic and Jill is denied pursuant to 11 U.S.C. § 727(a)(4)(A) and 11

U.S.C. § 727(a)(5).  Vic's debts to the Bank are excepted from discharge pursuant to 11

U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(6).  The discharge of Vic is also denied

pursuant to 11 U.S.C. § 727(a)(3)

A separate judgment will be entered in favor of the Bank in accordance with this

opinion.  Interest on said judgment shall accrue at the legal rate from the date of its entry.[30]

IT IS SO ORDERED.

_____ _James G. Mixon_ _____

JAMES G. MIXON
U. S. BANKRUPTCY COURT

DATE:___06/16/10_____

cc:   Warren Dupwe, Trustee
      Joseph Strode, Esq.
      Vaughn Knight, Esq.
      Louis Etoch, Esq.
      Debtors

EOD 6/16/2010
by P Becker

---

[30]Because of the substantial evidence of Bankruptcy fraud, Bank fraud, and violation of tax laws, this matter will be referred to the Justice Department for investigation.

61